# IN THE COURT OF APPEALS OF IOWA

No. 18-0222
Filed December 18, 2019

**MICHELLE LYNN KEHOE,**
     Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
     Respondent-Appellee.
_____

     Appeal from the Iowa District Court for Buchanan County, Richard D. Stochl, Judge.

     The applicant appeals from the denial of her application for postconviction relief. **AFFIRMED.**

     Jonathan M. Causey of Causey & Ye Law, P.L.L.C., Des Moines, for appellant.

     Thomas J. Miller, Attorney General, and Darrel Mullins and Andrew J. Prosser, Assistant Attorneys General, for appellee State.

     Considered by Vaitheswaran, P.J., and Potterfield and Doyle, JJ.

**POTTERFIELD, Judge.**

Michelle Kehoe appeals from the denial of her application for postconviction relief (PCR), following her 2009 convictions for murder in the first degree, attempted murder, and child endangerment resulting in serious injury. Kehoe argues she received ineffective assistance from trial counsel when counsel failed to 1) move to suppress the incriminating statements she made to police while in the hospital without first receiving *Miranda* warnings; 2) secure a different, more remote change of venue; and 3) raise the issue of Kehoe's competency to stand trial. In her supplemental pro se brief,[1] Kehoe joins some of the arguments made by counsel and also lists a number of errors she believes the PCR court made in its ruling.

## I. Background Facts and Proceedings.

On Sunday, October 26, 2008, Kehoe drove her two sons, who were seven and two years old, to Jesup, Iowa. At approximately 12:30 p.m., she stopped at a convenience store and asked where a park was located so her children could play. The store clerk named a couple of local parks. Kehoe took the children to a different park, purposely dropped her cell phone, and left. Next, she took the children to a secluded spot she had previously found near Littleton, Iowa—a location just a few miles from the park. In the early afternoon, she parked her vehicle near a pond and told the children she needed to get out of the

---

[1] Kehoe filed a supplemental pro se brief. We consider it as part of her appeal because this matter was already pending when Iowa Code section 814.6A took effect on July 1, 2019. *See State v. Macke*, 933 N.W.2d 226, 236 (Iowa 2019) (concluding the amendments to Iowa Code section 814.6 and 814.7 apply only prospectively—to appeals filed after the law took effect on July 1); *State v. Purk*, No. 18-0208, 2019 WL 5790875, at *7 n.8 (Iowa Ct. App. Nov. 6, 2019) (applying the reasoning of *Macke* and concluding section 814.6A "does not apply to this appeal, which was filed prior to July 1, 2019").

van.  Kehoe opened the back hatch, used duct tape she had already ripped into pieces to cover her children's eyes, and then slit both of their necks using a hunting knife.  She then doctored the scene, making it look like someone had attempted to perform first aid on the children and setting out a note detailing how a strange male had attacked them.  She then slit her own throat.

Kehoe lost consciousness for some time, but she came to the next day and walked to a nearby home for help.  There, she told the woman who came to the door that she and her children had been attacked by a man.  The woman in the home called for help immediately, at approximately 7:30 a.m. on October 27.

Once local medical personnel and police responded, Kehoe was airlifted to the University of Iowa Hospitals.  When police located the van next to the pond, the youngest child had died from the wounds to his neck.  The older child was alive and in the van.  He told the first responders that his mother had taken him out of the van into the woods and cut him with something; he said he began kicking her and she left him alone.  He relayed that his mother went to his brother next and that he passed out after he heard his brother screaming.  According to the seven year old, he woke up later and then got back in the van and hid.  He also told the medics that his mother had covered his eyes with duct tape.

Agents from the Iowa Department of Criminal Investigations (DCI) first made contact with Kehoe at approximately 10:00 a.m. on the morning of October 27, before she went into surgery.  Kehoe was intubated and unable to speak. The agents asked Kehoe if she could answer their questions and she indicated with her hands that she would need to write.  An agent gave her a notepad and pen and asked her what happened.  She wrote a note detailing that a man

attacked them, indicating[2] a man hid in the back of the van in Jesup; she could see him in her rear view mirror after they left the playground; he indicated she should turn east; she decided to use pepper spray she had with her to get away from him but he overpowered her, taped her up, and cut the boys; she regained consciousness and tried to help the children with the first aid kit, but the man came back and attacked her with a knife, and then she lost consciousness again. She also told the police that she had tried to write a note explaining the attack and that it was on a yellow paper in the van. According to the agent's testimony, the interaction with Kehoe took approximately three minutes and then she went into surgery.

The DCI agents next met with Kehoe at approximately 11:30 a.m. the next day, October 28. According to the trial testimony of Agent Chris Callaway, he and Agent Darrell Simmons spoke with Kehoe while she was in a hospital room, "laying in a bed, somewhat upright with—she was hooked up to some machines or various medical equipment." The agents asked medical staff if she was able to communicate with them or whether the medication she was taking or her injury would prevent it. They "had no indication that there would be any problem." Kehoe was still unable to speak during the meeting, so the agents asked her questions and then Kehoe wrote responses on paper. Additionally, the agents recorded the interview.[3] Agent Callaway began by telling Kehoe to let him know

---

[2] The note Kehoe wrote was admitted in the underlying trial as an exhibit. However, the PCR court was not asked to take judicial notice of the underlying felony file, so we do not have those exhibits as part of our record. Our understanding of the contents of the note Kehoe wrote before surgery is based on the agent's testimony reading and explaining the note during the trial (the transcript from the underlying trial is part of our record).
[3] We have neither the recording from the interview nor Kehoe's written responses; both were entered into evidence at the felony trial.

if at any time she did not want to talk anymore or needed a rest. Kehoe asked how her children were, and the agent did not respond. He then asked her what happened, and Kehoe again described the same allegation about a man who attacked them, including details about his weight, glasses, hair color, age, height, clothing, smell, the tone of his voice, and scars. During the interview, a nurse came in to check on and provide care for Kehoe; the agents left the hospital room for ten to fifteen minutes during this time.

Agent Callaway testified that when they returned, Kehoe immediately resumed writing answers without further prompting or questions from the agents. As she continued to provide an account of what she claimed took place, Kehoe wrote, "When Aunt Colleen was here yesterday [the oldest son] said I was trying to hurt him—trying to stop the bleeding. Turning head, applying pressure over [youngest son]—already purple lips. Cradled both of them." Agent Callaway understood this statement to be an explanation of why the oldest child had reported his mother was the one who hurt him. Agent Callaway initiated a second break, which he used to speak with the other agent and investigators outside of Kehoe's hospital room in order "to get a plan together to go back in and confront her on some of these things that [they] knew not to be true."

When the agents returned again, Agent Callaway told Kehoe that comparing her responses to what the investigators found at the scene, he still had more questions with which he thought she could help. Kehoe responded, "How can I help?" Agent Callaway asked more specific questions about Kehoe's previous statements before telling her that her oldest son was alive and "doing all right." He then told her a story about a traffic accident he experienced when he

was a state trooper involving a father who had fallen asleep while driving and whose son died as a result of the accident. After some more back and forth, Agent Callaway told Kehoe her story did not make sense and did not match what the oldest son was reporting. Kehoe then confessed to her actions. She told the agents where she purchased the knife. A nurse came back into the room then, and the agents left for another ten to fifteen minutes. While they were away, Kehoe wrote a note to the nurse asking to have the agents come back.

When the agents came back, Kehoe provided details, including that she slit the throat of her oldest son first because he is older and the youngest child would remain contained in the vehicle until she returned for him. The agents asked her about the duct tape she used, and Kehoe responded she had purchased it "a couple months ago" and told them where she purchased it. They asked her if she purchased the duct tape for this reason, and she responded, "It's sickening isn't it." She also told the agents the note she left in the van detailing the attack by an unknown man was first written a month before and then she rewrote it the morning of the incident.

Kehoe was charged with first-degree murder, attempted murder, and child endangerment resulting in serious injury.

Kehoe moved to have the venue of the trial changed from Buchanan County. To that end, on September 18, 2009, fifty-five potential jurors were sworn in and provided with a jury questionnaire for a mock jury in Buchanan County. The court excused fourteen potential jurors based on their answers to the questionnaire. A number of other potential jurors were interviewed by the attorneys. Based on the prospective juror's responses, the court concluded

approximately fifty percent of the prospective jurors held such a fixed opinion of the merits of the case that they could not impartially decide Kehoe's guilt or innocence. Additionally, the court noted the case had received extensive pretrial publicity in the area. The court granted Kehoe's motion for change of venue.

The trial took place over several days in October and November 2009 in Grundy County. Kehoe did not contest that she was the actor who slit her children's throats; she relied on a defense of legal insanity. Kehoe did not testify in her own defense, but two experts testified as to their opinion Kehoe was legally insane at the time of the incident. Both opined that while Kehoe understood the nature and quality of her actions—that she was, in fact, slitting the throats of her children and that such an action would cause death—she could not distinguish right from wrong at the time she did so. The experts noted Kehoe's stated belief that death would save the children from having their own experiences with mental-health issues and the shame of having a mother who died by suicide. Additionally, Kehoe believed that because of the children's ages, they would get to heaven and have eternal life there. The State's expert opined that Kehoe was not legally insane at the time of her actions, noting that she had taken great steps to conceal her identity as the perpetrator and her continued lie after the fact.

The jury convicted Kehoe of all three counts as charged.

Kehoe challenged her convictions on direct appeal, arguing trial counsel provided ineffective assistance in three respects: failing to challenge the constitutionality of Iowa Code section 701.4 (2007), which defined the legal standard for the insanity defense in Iowa; failing to request a jury instruction on

the consequences of a verdict of not guilty by reason of insanity; and failing to object to the marshalling instruction on attempted murder as not including malice aforethought as an element. A panel of this court affirmed Kehoe's convictions. *See State v. Kehoe*, 804 N.W.2d 302, 313 (Iowa Ct. App. 2011). Procedendo issued on September 23, 2011.

Kehoe filed her application for PCR on September 18, 2014, alleging trial counsel provided ineffective assistance in ten respects.

By the time of the PCR trial, in September 2017, Kehoe had abandoned some of her claims. She contended trial counsel provided ineffective assistance by failing to 1) explain and advise Kehoe as to her right to testify; 2) call Kehoe as a witness at trial; 3) discuss the pros and cons of Kehoe testifying with her, which prevented Kehoe from participating in the decision of whether she should testify; 4) adequately seek a change of venue or otherwise contest the change of venue to Grundy County; 5) obtain proper medication treatment or medication for Kehoe leading up to and during the trial, which rendered Kehoe unable to participate in the proceedings; and 6) appreciate that Kehoe was unable to participate in her own defense during trial due to her mental status. Neither the State nor Kehoe asked the PCR court to take judicial notice of the record from the underlying trial. Kehoe introduced into evidence twenty-nine exhibits, which were generally notes from mental-health providers who treated Kehoe before and after the trial. The State introduced seven exhibits: the transcript of the trial, a transcript of the attorney's deposition, a transcript of Kehoe's deposition, the reports of both experts Kehoe hired in the underlying trial, this court's opinion in

Kehoe's direct appeal, and the district court's written ruling on the motion to move the felony trial from Buchanan County.

Kehoe testified at the PCR trial; she shared her lengthy history of mental-health issues. Kehoe maintained that trial counsel never advised her of the disadvantages of her testifying at trial. She testified she told counsel that the jury needed to hear her story from her, but counsel never undertook any trial preparation with her as to what questions she would be asked or what counsel's approach would be. Kehoe said counsel's only advice was that "cross-examination by the prosecutor would be brutal" and "any time they ask a question, pause first and allow us to object." Kehoe maintained that on the third day of trial, she told counsel, "I do not feel stable to testify." Kehoe also testified about the medications she was prescribed while she was in jail pending trial, her mental status throughout the time she was in jail and through trial, and her desire to have more medical treatment throughout. She noted that the last time she received treatment from a psychiatrist before her trial was on September 9, 2009—about a month and a half before. After that psychiatrist went on sabbatical, no other doctor took over her care until after she was convicted.

One of Kehoe's two trial attorneys testified by way of deposition; the other was not called to testify. When asked if she could testify as to how Kehoe appeared to her throughout the time she represented her, the attorney testified:

> She had times when she was in a better frame of mind than other times when she was perhaps more emotionally upset, more irritable. And irritability is a common symptom of depression, I will say that.
> So her emotional states had quite a bit of variability to it. The one thing that was consistent over time was that Ms. Kehoe was an intelligent person. She was obviously educated. Better

educated than many Public Defender Office clients. She had a good vocabulary. Her thought processing was good at all times. I mean, from an intellectual standpoint, she had very good intellectual functioning. She was not someone who was developmentally disabled or had that type of problem, very clearly.

The attorney also testified as to how Kehoe participated in her defense, noting Kehoe

made lists of things that she discussed with me. She made lists of points that she was concerned about or details that she was concerned about and brought them to my attention either, like I say, directly or through the investigators. She is a very organized person, and—I mean, she would make notes on things that were incorrect or she wanted explored.

The attorney remembered that there were problems getting Kehoe ongoing mental-health treatment while she was in jail pending trial; the attorney remembered discussing the issue with her investigator four or five times. But, the attorney testified she never had any concerns as to Kehoe's competence to stand trial. Additionally, she noted that neither of the experts hired by Kehoe—a psychiatrist and a psychologist—who each met with and reviewed the medical history of Kehoe indicated any concern regarding Kehoe's competency. She noted, "I communicated with her, she communicated back. We could discuss things the same way that you and I can discuss things across this table."

Trial counsel was also asked about the change of venue for the trial—from Buchanan County to Grundy County. The following exchange occurred between Kehoe's PCR counsel and trial counsel:

Q. Okay. A concern that is raised by my client, as we have discussed this, is why the change of venue would have been proper from Buchanan County to Grundy County when you take into account they're in roughly the same media market. Did that ever come up in your discussion of a proper venue? A. Yes.

Q. And how did you try to address that? A. I was not happy about it being in Grundy County. My recollection is that the trial judge had decided on Grundy County and that was how it was going to be, and if we hadn't—if we hadn't gotten jurors in Grundy County who said they hadn't formed an impression based on anything they knew about the case—I think jury selection was reported. That would have been my practice. And I would have renewed it during jury selection process if I thought we had a situation where we could renew our motion and I could move the judge away from the decision that he had made.

But my recollection is, we didn't end up in circumstances where it would have been realistic for me, first of all, to renew the motion, and, second of all, for the trial judge to actually grant it. I would have preferred being further away with the trial myself, but, like I said, the decision had been made and it would have taken more than I remember we had to get that decision changed or reconsidered.

Additionally, the psychiatrist who initially treated Kehoe while she was in jail—before the psychiatrist left on a sabbatical in September 2009—testified by way of deposition. He opined that Kehoe was able to understand the charges against her during the period leading up to trial but stated she had "severe treatment-resistant mental illness" and indicated that "such profound illness would make meaningful participation with her legal team tenuous." When asked what he meant by tenuous, the doctor stated "It means she would have difficulty." He agreed that while he was treating her, he never communicated to the attorneys, the court, or anyone else that he felt Kehoe was incapable of participating in her defense.

The PCR court denied Kehoe's PCR application. In its written ruling, the court incorrectly stated Kehoe had abandoned her claim about the change of venue; the court did not address the claim. In considering her claim that she received ineffective assistance from counsel for their failure to raise issues regarding her competency to stand, the court ruled:

This court does not find her attorneys, considering she was under regular medical care, had any duty to obtain further medical opinions as to her ability to assist in her own defense and stand up for herself in confrontations with them. The court therefore finds that counsel was not ineffective in failing to participate more fully in [Kehoe's] medical care and in failing to recognize any perceived medical issues.

The court also found Kehoe's claim counsel provided ineffective assistance by not calling her to testify in her own defense to be meritless; the court noted that it was "clearly trial strategy" on the part of counsel to advise Kehoe against testifying, as counsel determined Kehoe would not hold up well under cross examination and believed the experts could better tell Kehoe's backstory of trauma and mental-health issues.

Kehoe appeals.

## II. Standard of Review.

We generally review PCR proceedings for correction of errors at law, but when the applicant alleges ineffective assistance, we review de novo. *See Ledezma v. State*, 626 N.W.2d 134, 141 (Iowa 2001).

## III. Discussion.

Kehoe raises three claims of ineffective assistance. As she did before the PCR court, she maintains trial counsel was ineffective for failing to raise the issue of her competency to stand trial. She also argues PCR counsel was ineffective for failing to file a motion to reconsider after the PCR court incorrectly stated she abandoned her claim trial counsel was ineffective for not requesting a different, more remote change of venue. And, for the first time, she argues all counsel provided ineffective assistance by failing to raise the issue of suppression regarding the statements she made to the DCI agents while in the hospital.

To succeed on a claim of ineffective assistance, Kehoe has the burden to prove (1) her trial counsel failed to perform an essential duty and (2) she was prejudiced by this failure. *See Lado v. State*, 804 N.W.2d 248, 251 (Iowa 2011). To prove counsel failed to perform an essential duty, Kehoe "must show that counsel "was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). We measure effective performance by determining "whether counsel's assistance was reasonable considering all the circumstances." *See id.* at 688. To prove prejudice, Kehoe must prove "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. To show a reasonable probability the result would have been different, she must demonstrate the probability of a different result is enough to undermine our confidence in the outcome. *See Bowman v. State*, 710 N.W.2d 200, 206 (Iowa 2006) (quoting *State v. Graves*, 668 N.W.2d 860, 882–83 (Iowa 2003)). "There is a strong presumption counsel's representation fell within the wide range of reasonable professional assistance, and Kehoe is not denied effective assistance by counsel's failure to raise a meritless issue." *Kehoe*, 804 N.W.2d at 305.

**A. Failure to Move to Suppress Statements.**

Kehoe maintains trial counsel provided ineffective assistance by failing to file a motion to suppress the statements she made to DCI agents while in the hospital. She contends her statements were the product of custodial interrogation without the benefit of *Miranda* warnings and that they were involuntarily made. If Kehoe cannot prove a motion to suppress would have

been meritorious, her claims fails. *See State v. Carroll*, 767 N.W.2d 638, 645 (Iowa 2009) (considering the defendant's claim of ineffective assistance for failure to file a motion to suppress and starting with the question of whether such a motion would have had merit).

First we consider whether Kehoe has proved trial counsel could have successfully pursued a motion to suppress because the DCI agents did not advise her of the *Miranda* warnings. *See State v. Countryman*, 572 N.W.2d 553, 557 (Iowa 1997) ("We utilize a dual test in determining the admissibility of a defendant's inculpatory statements over a Fifth Amendment challenge. We first determine whether *Miranda* warnings were required and, if so, whether they were properly given. Second, we ascertain whether the statement is voluntary and satisfies due process." (citations omitted)). "*Miranda* warnings are not required unless there is both custody and interrogation." *Id.* Therefore, we must determine whether Kehoe was in custody at the times she made the incriminating statements. "A court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there was a formal arrest or restraint on freedom of movement of the degree association with formal arrest." *State v. Tyler*, 867 N.W.2d 136, 171–72 (Iowa 2015) (altered for readability) (citations omitted). "To determine whether the suspect's freedom of movement was restricted to such a degree, we apply an objective analysis and ask whether a reasonable person in the defendant's position would have understood [her] situation to be one of custody." *State v. Bogan*, 774 N.W.2d 676, 680 (Iowa 2009). "The custody determination depends on the objective

circumstances of the interrogation, not on subjective views harbored either by the officer or the person being questioned." *Countryman*, 572 N.W.2d at 557.

To make the determination whether Kehoe was in custody at the time she spoke with the DCI agents—both before she went into surgery and the next day—we use a four-factor test: 1) the language used to summon the individual; 2) the purpose, place, and manner of interrogation; 3) the extent to which the defendant is confronted with evidence of her guilt; and 4) whether the defendant is free to leave the place of questioning. *Id.* at 558.

Kehoe compares the facts of her case to that of *State v. Chiavetta* and *State v. Ellenbecker.* In *Ellenbecker*, a "DCI agent chased [the defendant], caught him, struggled with him, and prevented him from returning to his apartment by physical force." No. 12-2229, 2014 WL 1999291, at *7 (Iowa Ct. App. May 14, 2014). The defendant was then "shot by a different agent and physically restrained until an ambulance arrived—including a period of restraint with handcuffs. A trooper rode in the ambulance to the hospital." *Id.* Our court determined the defendant was in custody throughout this time. *Id.* Additionally, despite the State's argument the defendant was not in custody once he reached the hospital "because the only restraint imposed on his freedom of movement was his need for medical treatment," our court found the custody continued, in part, since the defendant "was transferred to the hospital 'after being previously within police custody.'" *Id.* at *8. The mere fact a suspect cannot leave the hospital as a result of injury or illness does not place that person in the custody of law enforcement, but the other circumstances surrounding the restraints on the defendant's liberty may render it custody. *See id.* (citing *State v. Grant*, 939 A.2d

93, 101–02 (Me. 2008)). Because of the surrounding facts and circumstances, our court concluded a reasonable person in the defendant's position would have understood themselves to be in police custody, making *Miranda* warnings necessary. *Id.* at *9. We reversed and remanded for further proceedings with any statements made by the defendant while in custody suppressed. *Id.*

In *Chiavetta*, a woman suspected of killing her husband attempted suicide and was taken to a local hospital. No. 05-1911, 2007 WL 1828323, at *1 (Iowa Ct. App. June 27, 2007). Two days after she was admitted to the hospital, police officers sought and received permission of medical personnel to interview the defendant. *Id.* Although the officers went to the defendant's hospital room in the intensive care unit while she was hooked up to a number of medical devices and were alone with her at the time, the defendant's room was enclosed by glass and could be seen from the nurse's station. *Id.* at *2. The interview lasted less than forty minutes. *Id.* At one point, the defendant expressed she wanted to talk to an attorney, but before the officers left, she "reached out and touched" one of the officer's arms. *Id.* When the officer asked the defendant if she wanted to talk, she nodded yes and then confessed to killing her husband. *Id.* The "only circumstances limiting [the defendant's] ability to leave were medical circumstances, such as the intravenous lines in her arms and the fact she had not been medically discharged." *Id.* at *3. Considering all of the surrounding facts and circumstances, our court concluded the defendant was not in police custody at the time she confessed and, therefore, the statements she made without the benefit of *Miranda* did not need to be suppressed. *Id.*

The facts and circumstances in Kehoe's case—insofar as we have a record that discloses them—are more like those in *Chiavetta*. Kehoe was not in police custody immediately preceding or at the time she was airlifted to the hospital. While she was still a patient in the hospital and hooked up to a number of machines at the time the agents interviewed her the day after her surgery, the agents first asked medical personnel if they could speak with Kehoe. The agents and Kehoe were the only people in the room most of the time, but it does not seem the agents restricted access to the room, as nurses came and went during the time they spoke. Additionally, at the beginning of the interview, Agent Callaway informed Kehoe she could stop at any time if she felt tired or wanted to end the interview. Agent Callaway testified he was not aggressive with Kehoe; he tried to build a rapport with her. The agents confronted Kehoe with her guilt insofar as they told her the story she first told did not match up with what her son was saying. Kehoe made some inculpatory statements before a nurse came in and interrupted the interview. The agents left the room while the nurse assisted Kehoe; Kehoe asked the nurse to send the agents back in. When they returned, Kehoe resumed writing her confession without prompting. With these facts, we cannot say Kehoe was in custody at the time she confessed to the agents.[4]

Next we consider whether Kehoe's statements were involuntarily made. If Kehoe had filed a motion to suppress, the State would have the burden to prove, by a preponderance of the evidence that Kehoe's inculpatory statements were

---

[4] We recognize the record is devoid of any indication how long the interview took or whether nurses and others could see into the room during the interview. Kehoe bears the burden to prove a motion to suppress would have been successful because she was in custody at the time she made inculpatory statements.

voluntary given. *See State v. Morgan*, 559 N.W.2d 603, 606 (Iowa 1997). But, as Kehoe has raised this as an issue of ineffective assistance, she bears the burden to prove a motion to suppress would have been successful in order to show trial counsel breached an essential duty in failing to file one. *See State v. McCoy*, 692 N.W.2d 6, 20 (Iowa 2005) ("At this point, the critical question is whether the motion to suppress would have been successful."). We employ the totality-of-circumstances test in determining voluntariness: it must appear the statements were the product of "an essentially free and unconstrained choice, made by the defendant whose will was not overborne or whose capacity for self-determination was not critically impaired." *Countryman*, 572 N.W.2d at 558 (citation omitted). In determining whether her statements were involuntarily obtained, we consider:

> The defendant's knowledge and waiver of [her] *Miranda* rights, the defendant's age, experience, prior record, level of education and intelligence, the length of time the defendant is detained and interrogated, whether physical punishment is used, including the deprivation of food or sleep, the defendant's ability to understand the questions, the defendant's physical and emotional condition and his reactions to the interrogation, whether any deceit or improper promises were used in gaining the admissions, and any mental weakness the defendant may possess.

*State v. Morgan*, 559 N.W.2d 603, 608 (Iowa 1997).

Kehoe largely bases her argument on the fact that she suffered from mental-health issues and was on a number of medications at the hospital during the time the agents interviewed her. The record before us contains a progress note completed by hospital personnel on October 29, 2009—the day after Kehoe confessed to the agents—and lists a number of medications that were prescribed to her in the preceding forty-eight hours. But we do not know when she took

those medications (before or after speaking to the agents) and also do not know the effects those medicines may have had. In her appellate brief, Kehoe cites to various websites for information of possible side effects of some of the medications, but none of that information is in the record before us, and, even more importantly, no information regarding the side effects Kehoe actually suffered is before us. "The mere fact that one is under the influence of a drug while making an inculpatory statement does not rend the statement involuntary." *State v. Vincik*, 698 N.W.2d 788, 793 (Iowa 1987). Moreover, the agents spoke to medical staff about whether Kehoe was able to speak to them before they initiated the interview.

Kehoe did not have a criminal record before this incident and had little involvement with police; her knowledge of her rights and her lack of experience with the system weigh in favor of finding her statements were involuntary. Additionally, her mental-health issues are well-documented, and she was still a patient in the hospital following surgery. But Kehoe was also a grown woman who had a college degree and an exceptionally high IQ. We do not know how long the interview lasted, but there is no indication the agents used physical punishment, deprived Kehoe of food or water, or made any untruthful or improper statements to Kehoe. Additionally, based on the back and forth between Agent Callaway's questions and Kehoe's written answers, it is clear she understood the questions being asked of her and could answer—in writing—in an appropriate manner. "Coercive police activity is a necessary predicate to finding that a confession is not voluntary." *State v. Conger*, 434 N.W.2d 406, 408 (Iowa 1988). Kehoe has not proved her statements were involuntarily given.

Because Kehoe has not proved a motion to suppress would have been successful, counsel did not breach an essential duty by not moving for suppression. This claim fails.

**B. Change of Venue.**

Kehoe maintains trial counsel breached an essential duty by not securing a different, more remote change of venue than Grundy County. Although she initially raised this issue in her PCR application, the PCR court incorrectly stated she had abandoned the issue and did not rule on it. Kehoe argues PCR counsel provided ineffective assistance by failing to file a post-trial motion to obtain a ruling on her claim. Kehoe must prove a motion for a second change of venue would have been successful in order to establish that PCR counsel and trial counsel each breached an essential duty.

In asking for a change of venue, the moving party has "the burden to either establish prejudice in fact, or to show the publication of material which is so potentially prejudicial that prejudice must be presumed." *State v. Cuevas*, 288 N.W.2d 525, 527 (Iowa 1980). The court shall change the venue for a trial when "such degree of prejudice exists in the county in which the trial is to be held that there is a substantial likelihood a fair and impartial trial cannot be preserved with a jury selected from that county." Iowa R. Crim P. 2.11(10)(b).

Here, Kehoe must establish prejudice in fact in order to be successful, as the record before us is devoid of any information regarding the nature, tone, timing, or volume of pretrial publicity. *See State v. Evans*, 671 N.W.2d 720, 726 (Iowa 2003) (requiring the defendant to show the publicity attending the trial was so pervasive that prejudice could be presumed and considering "the nature, tone,

and accuracy of the articles; their timing in relation to the trial; and the impact of the publicity on the jurors as revealed through voir dire"); *see also State v. Spargo*, 364 N.W.2d 203, 208 (Iowa 1985) ("The media accounts are factual and informative in tone and as such do not support defendant's claim that they must be presumed to have created prejudice against him.").

Kehoe argues she could not get an impartial trial in Grundy County because all of the potential jurors had heard about the case beforehand and had discussed it with their friends and family before getting the summons for jury duty. But that is not the standard for finding prejudice. "A juror need not be completely ignorant of the issues and events involved in a trial." *State v. Voelkers*, 547 N.W.2d 625, 629 (Iowa Ct. App. 1996). The question is "whether the juror holds such a fixed opinion of the merits of the case he or she cannot impartially judge the guilt or innocence of the defendant." *Id.* at 629–630. Here, a few individuals stated during voir dire that their minds were made up and they would be unable to determine the case solely on what they heard at trial; none of those potential jurors served on the jury. Kehoe has not established prejudice in fact such that her counsel breached an essential duty by failing to move for a second change of venue. *See State v. Simmons*, 454 N.W.2d 866, 868 (Iowa 1990) (concluding vigorous voir dire conducted in the case, where only two of the sixty prospective jurors were completely unfamiliar with the case, "was clearly effective in routing out any juror prejudice"). This claims fails.

**C. Issue of Competency.**

Kehoe argues trial counsel breached an essential duty by not raising the issue of her competency to stand trial. *See State v. Lyman*, 776 N.W.2d 865,

871 (Iowa 2010) ("The trial of an incompetent defendant in a criminal matter violates the defendant's due process rights as guaranteed by the Fourteenth Amendment to the United States Constitution."), *overruled on other grounds by Alcala v. Marriott Intern'l, Inc.*, 880 N.W.2d 699, 708 n.3 (Iowa 2016). We recognize the difficulty in determining post hoc whether someone was previously competent—especially this number of years later. *See, e.g.*, *State v. Harris*, No. 12-2139, 2014 WL 2432588, at *6 n.5 (considering a post-trial competency hearing). We also recognize that Kehoe did not receive perfect care while pending trial; after her psychiatrist went on sabbatical in early September 2009, Kehoe did not see another psychiatrist in the approximately six weeks leading up to trial. But Kehoe continued to see a social worker, and she continued to receive her prescribed medications. The social worker never expressed concern Kehoe was incompetent. Kehoe also met with a number of mental health experts—both those hired by her and the one hired by the State—between the time of her arrest and the trial, and none expressed a concern about her competency. At the PCR trial, Kehoe's trial attorney testified that Kehoe, though experiencing issues with mental health, understood the charges against her and participated in her defense. Even the psychiatrist who was treating Kehoe during most of her time in jail (before going on sabbatical), when testifying at the PCR trial, did not opine that Kehoe had been incompetent to stand trial.

"A history of mental illness, standing alone, does not mean the defendant is incompetent." *State v. Rieflin*, 558 N.W.2d 149, 153 (Iowa 1996), *overruled on other grounds by Lyman*, 776 N.W.2d at 873. The question is whether defendant can "(1) appreciate the charge[s], (2) understand the proceedings, and (3) assist

effectively in the defense." *Id.* at 152–53. Based on the record before us, we cannot say counsel breached an essential duty by not raising the issue of Kehoe's competency before or during trial. *See id.* at 152 (noting we start with the presumption that a defendant is competent to stand trial and the defendant has the burden to prove otherwise).

### D. Pro Se Issues.

While we have considered Kehoe's supplemental brief as part of her appeal, we cannot address any of her claims. She lists seventeen errors she maintains the PCR court made in its ruling, but she does not challenge the alleged errors under any legal theory and does not explain how these alleged issues are preserved for our review. Additionally, she makes no cite to the record and includes just one cite to one authority apropos of nothing. In characterizing some of the statements made by the PCR court as errors, she appears to rely on outside-the-record explanations, such as conversations she had with her trial counsel leading up to the underlying trial. *See* Iowa R. App. P. 6.801 ("Only the original documents and exhibits filed in the district court case from which the appeal is taken, the transcript of proceedings, if any, and a certified copy of the related docket and court calendar entries prepared by the clerk of the district court constitute the record on appeal.").

Because she makes no cognizable legal claims and her supplemental pro se brief fails to comport with the appellate rules of procedure, we do not consider any of the issues further. *See In re Estate of DeTar*, 572 N.W.2d 178, 181 (Iowa Ct. App. 1997) ("We are not bound to consider a party's position when the brief fails to comply with the Iowa Rules of Appellate Procedure."); *see also Metro.*

*Jacobson Dev. Venture v. Bd. of Review of Des Moines*, 476 N.W.2d 726, 729 (Iowa Ct. App. 1991) ("We do not utilize a deferential standard when persons choose to represent themselves. . . . Rather, all are expected to act with equal competence.").

**IV. Conclusion.**

Because Kehoe has not proved any of her claims of ineffective assistance have merit, we affirm the denial of her application for PCR. As for her pro se claims, she makes no cognizable legal claims and her supplemental pro se brief fails to comport with the appellate rules of procedure; we do not consider any of those issues.

**AFFIRMED.**