Frederick J. MARTINEAU,
Petitioner-Appellant,

v.

Everett I. PERRIN, Jr., Warden, New
Hampshire State Prison,
Respondent-Appellee.

No. 78–1368.

United States Court of Appeals,
First Circuit.

Argued March 14, 1979.

Decided June 25, 1979.

David Feld, Boston University Law Student with whom John Leubsdorf, Associate Professor of Law, Boston, Mass., court-appointed counsel, and Wayne Dziedzic, Boston University Law Student, Boston, Mass., were on brief, for petitioner-appellant.

Richard B. Michaud, Asst. Atty. Gen., Concord, N. H., with whom Thomas D. Rath, Atty. Gen., Concord, N. H., was on brief, for respondent-appellee.

Before COFFIN, Chief Judge, BOWNES, Circuit Judge, PETTINE, District Judge.*

BOWNES, Circuit Judge.

The central issue in this habeas corpus appeal is whether petitioner, Frederick J. Martineau, waived his sixth amendment right to a public trial.

We outline the facts and legal steps leading to this appeal. Petitioner was tried and convicted of attempted burglary in a jury waived trial that lasted for six days. He promptly brought a petition for writ of habeas corpus in the New Hampshire Supreme Court on the grounds that he was denied a public trial because the doors to the courtroom were locked and the public excluded for a portion of the trial. The case was remanded to the New Hampshire Superior Court to make findings since disputed facts were involved. *See LaBelle v. State,* 108 N.H. 241, 231 A.2d 480 (N.H. 1967). The Superior Court, after a full evidentiary hearing, made eight specific findings of fact and concluded that petitioner had suffered no prejudice and "in any event to the extent that the outer doors were locked prior to March 15, 1976, the same was waived."[1]

The facts as found by the New Hampshire Superior Court can be summarized as follows. There was a hearing on a motion to suppress on March 3, 4, and 8, 1976, immediately prior to the trial, at which the courtroom was locked pursuant to an order of the court and without objection by petitioner or his counsel. The trial in chief commenced on March 9 and continued on the 10th, 11th, 15th, 16th and 17th. The court at no time directed the courtroom doors to be locked, but did continue its suppression hearing order that all witnesses be sequestered. It is not possible to determine from behind the bench whether the doors to the courtroom are locked or unlocked. Neither petitioner nor his attorney objected at any time as to how the witnesses were admitted to the courtroom or as to those present in the courtroom. On March 15, the court learned for the first time from a court attendant that the outer doors to the courtroom were being unlocked and locked as each witness entered the courtroom and that the petitioner had complained about this. The court immediately ordered that the courtroom doors remain unlocked for the balance of the trial.

The New Hampshire Supreme Court, based on its review of the transcript of the Superior Court evidentiary hearing, made specific findings and concluded that petitioner had waived his right to a public trial. *Martineau v. Helgemoe,* 379 A.2d 1040 (N.H.1977).[2] The pertinent portions of its opinion are:

At some time, it was learned by defense counsel that the doors were locked. During a discussion with Martineau, his lawyer told him he was not disturbed and it was probably to his advantage because it would keep adverse press coverage down and also would prevent the police from planting someone in the courtroom to report back the testimony to the next witness thus reducing the effectiveness of the sequestration order. His counsel testified that he thought Martineau agreed with him at that time. Later when Martineau brought up the subject, counsel told him that if he wanted to "bring it to the court's attention that he had a perfect right to stand up and tell the court that at any time he wanted to." At no time did Martineau or counsel inform the court of the locked doors. The court learned of the locked doors through a bailiff who stated that he heard "some complaint . . . by persons in the corridor and by Mr. Martineau." . . . Defense counsel made a deliberate tactical decision not to inform the court or to object because he felt it was to Marti-

---

* Of the District of Rhode Island, sitting by designation.

1. The same Superior Court Justice who tried the criminal case presided at the habeas corpus evidentiary hearing.

2. The New Hampshire Supreme Court, undoubtedly aware of the prevailing law, did not advert at all to the Superior Court's finding that petitioner had suffered no prejudice.

neau's advantage. Martineau agreed with this. Later Martineau was given the chance to object if he did not agree but failed to inform the court of the facts or of any objection but rather waited until after the guilty verdict. This constituted a deliberate and intelligent waiver.

*Id.* at 1041.

Petitioner next brought a petition for habeas corpus in the District Court of New Hampshire alleging that his sixth amendment right to a public trial had been violated. This was denied by the district court on the grounds "that petitioner had deliberately and intelligently waived his right to a public trial" and "that petitioner could make no claim of prejudice and to the contrary there is the strong suggestion that he benefited by the circumstances which surrounded his trial." We issued a certificate of probable cause and this appeal followed.

■ Before tackling the difficult question of waiver, we first clear away the underbrush of the "no prejudice" findings of the New Hampshire Superior Court and the district court. It is a settled rule of the federal courts "that a showing of prejudice is not necessary for a reversal of a conviction not had in public proceedings." *Levine v. United States*, 362 U.S. 610, 627 n.*, 80 S.Ct. 1038, 1048, 4 L.Ed.2d 989 (Brennan, J., dissenting) (1960). *See also United States v. Eisner*, 533 F.2d 987, 993 (6th Cir. 1976); *United States ex rel. Bennett v. Rundle*, 419 F.2d 599, 608 (3d Cir. 1969); *United States v. Kobli*, 172 F.2d 919, 921 (3d Cir. 1949); *Tanksley v. United States*, 145 F.2d 58 (9th Cir. 1944); *Davis v. United States*, 247 F. 394, 398 (8th Cir. 1917). The question of prejudice is, therefore, immaterial.

■ In assessing the factual findings of the state courts as to waiver, we are bound by the provisions of 28 U.S.C. § 2254(d), keeping in mind that what constitutes a valid waiver is not a question of historical fact, but one that requires the application of constitutional principles to the facts as found. *Brewer v. Williams*, 430 U.S. 387, 403–04, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); *Brown v. Allen*, 344 U.S. 443, 507, 73 S.Ct. 397, 97 L.Ed. 469 (1953). There is nothing in the transcript or New Hampshire Supreme Court opinion that would negate the presumption of factual correctness mandated by 28 U.S.C. § 2254(d): the merits of the factual disputes were resolved in the state court hearing, 2254(d)(1); the fact finding procedure employed by the state court was adequate to afford a full and fair hearing, 2254(d)(2); the material facts were adequately developed at the state court hearing, 2254(d)(3); the state court had jurisdiction over the petitioner, 2254(d)(4); the petitioner was represented by counsel, 2254(d)(5); the petitioner received a full and fair hearing in the state court proceeding, 2254(d)(6), and was not otherwise deprived of due process of law, 2254(d)(7); and the factual determinations made by the state courts are fairly supported in the record, 2254(d)(8).[3]

■ We are, of course, mindful of our duty to make our own independent determination of petitioner's federal claim, "without being bound by the determination on the merits of that claim reached in the state proceedings." *Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 2507, 53 L.Ed.2d 594 (1977); *Brown v. Allen, supra*, 344 U.S. at 443, 73 S.Ct. 397.

The salient facts to which we apply the requisite constitutional principles are essentially undisputed and can be stated as follows. Due to a misunderstanding by the court officer, the courtroom doors were locked for three days and part of a fourth of a six day trial. The court was not aware of the situation and when it found out about it, it ordered the doors unlocked and

**3.** We realize that petitioner testified at the state evidentiary hearing that he, not defense counsel as the State Supreme Court found, first discovered that the courtroom doors were locked and that he called it to the attention of defense counsel, not vice versa, as found by the New Hampshire Supreme Court. There is, however, positive testimony by petitioner's attorney, Robert Chiesa, that the locked doors were called to his attention by a witness, one Jordan, and that he informed petitioner of the situation.

they remained open for the balance of the trial. Members of the public and friends of the petitioner could not enter the courtroom during the first three days of the trial. Law students were present during the entire trial in addition to counsel and the usual court officers. Petitioner's attorney found out about the locked doors sometime before the judge was informed of the situation. Although the record is not entirely clear as to just when in the trial this was, by using a 1976 calendar and the findings of the Superior Court as to the trial dates, we can approximate when Attorney Chiesa first found out that the courtroom doors were locked. He testified that he thought he learned about the locked doors on the fifth day of trial. He was more certain that it was in the second week of the trial.[4] It is, therefore, reasonable to deduce that Attorney Chiesa may have learned about the locked doors as late as March 15, which was the start of the second week of trial. This was also the day on which the judge was informed of the situation. The only other reasonable deduction is that the attorney counted the suppression hearing as part of the trial. The dates of the hearing were March 3 and 4 (Wednesday and Thursday) and March 8 (Monday of the following week). This alternative inference would put the date of discovery on March 10, which was the second day of the trial.

There is no doubt that petitioner's attorney deliberately decided not to object. He felt that a locked courtroom inured to the benefit of the petitioner because it would prevent the police from planting someone in the court to listen to the testimony and then relay it to the prosecution's sequestered witnesses. The attorney also felt that the closed courtroom reduced the possibility of adverse newspaper comment by the local newspaper, The Manchester Union Leader. This reasoning was explained to petitioner and counsel thought he agreed with him at that time. Sometime later, petitioner objected repeatedly and strenuously to the locked courtroom and asked his attorney to inform the court of the situation and put an objection on the record. This the attorney refused to do on the grounds that the trial was going well and he didn't want to "mousetrap the judge." Attorney Chiesa told petitioner that, while he would not object, petitioner could do so "at any time he wanted to."

The sixth amendment right to a public trial was examined in *In Re Oliver*, 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948), and the Court held:

> In view of this nation's historic distrust of secret proceedings, their inherent dangers to freedom, and the universal requirement of our federal and state governments that criminal trials be public, the Fourteenth Amendment's guarantee that no one shall be deprived of his liberty without due process means at least that an accused cannot be thus sentenced to prison.

*Id.* at 273, 68 S.Ct. at 507. This right extends to state criminal trials. *In Re Oliver, supra; Duncan v. Louisiana*, 391 U.S. 145, 149, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

It is also firmly established that a criminal defendant can "waive his constitutional right to a public trial." *Singer v. United States*, 380 U.S. 24, 34–35, 85 S.Ct. 783, 790,

---

4. His exact testimony on this point is:

Q. And were you, sir, on the horns of a dilemma at the time that you found the courtroom was locked?

A. Yes, I was. I—brought it to the attention of Mr. Martineau during one of the breaks. I think that it was about, oh, my best recollection, it was about five days into trial. I may be wrong on that, because I know we suspended one day, or something, but it was in the second week, let me put it that way, and I told Mr. Martineau about it. I further told him that I was not at all distressed by the fact, and as a matter of fact, I thought that it was probably— to Mr. Martineau's advantage, because there wasn't a lot splashed in the press, and—I didn't—I also felt it was worthwhile in the sense that—I thought that the police may have a witness—not a witness, but somebody planted in the courtroom to listen to what one of the other ones said so they could relay it back to the next witness, and—I brought it to his attention at that time.

13 L.Ed.2d 630 (1965); *Levine v. United States, supra,* 362 U.S. at 619, 80 S.Ct. 1038.

■ We agree with petitioner that, since a constitutional right is involved, there had to be an intentional and knowing waiver. *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); *Schneckloth v. Bustamonte,* 412 U.S. 218, 237, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Christian,* 571 F.2d 64, 68–69 (1st Cir. 1978); *United States v. Lespier,* 558 F.2d 624, 629–30 (1st Cir. 1977); *Maynard v. Meachum,* 545 F.2d 273 (1st Cir. 1976).

■ Our analysis of the facts leads us to the conclusion that petitioner himself and through his counsel did knowingly and deliberately waive his right to a public trial. It is important to point out that what we are really talking about here is whether or not there should have been a motion for a mistrial. By the time petitioner or his counsel had found out that the courtroom doors were locked, at least two days, and probably three, of the trial had been completed. Petitioner does not suggest that if his attorney had immediately objected to the locked doors, this would have cured the constitutional violation that had already taken place. At the most it would have limited the violation to two days instead of three or three and one-half. As he testified at the evidentiary hearing, petitioner's attorney was caught on the horns of a dilemma at the time he discovered that the doors were locked. He felt that the case was proceeding well and saw no harm suffered by the petitioner due to the closed courtroom. In fact, he felt that the effect was probably to petitioner's benefit. If a motion for mistrial were made and granted, then what was perceived at the time as a good chance for acquittal would go down the drain. Counsel fully explained the situation to petitioner, told him what his decision was and then informed his client that "at any time he wanted to" he could get up and object himself, which petitioner did not do.

Under the circumstances that prevailed here, we do not view this as one of those basic decisions such as whether to plead guilty, waive a jury, or testify, that ultimately is for the accused to make himself. *See Wainwright v. Sykes, supra,* 433 U.S. at 93 n.1, 97 S.Ct. 2497 (Chief Justice Burger, concurring).

Petitioner's failure to object on his own cannot be interpreted as anything other than a knowing and intentional waiver. The situation was explained to him by his attorney, his attorney refused to object despite petitioner's prodding, and his attorney told him that he could object himself if he wanted to. Petitioner's failure to object was the result of a conscious decision on his part. Petitioner does not, and, under the facts, could not claim that his attorney misled him in any way or made any misrepresentations to him. What petitioner is really complaining about is his attorney's refusal to follow his directions. While the statement of Attorney Chiesa that he did not want to "mousetrap" the judge may have reflected some concern as to his own reputation with the court, we cannot say that the refusal to object mousetrapped petitioner in any way. When faced with the decision as to whether to move for a mistrial or go forward, the attorney made a deliberate choice. This was a tactical decision. He explained what he had decided and the reasons for it and then told petitioner that he could object personally if he wanted to. Petitioner cannot now say that he was misled as to or deprived of his right to object.

What we said in *United States v. Lespier, supra,* 558 F.2d 624, applies here:

[W]e long ago made it clear that an accused cannot easily disassociate himself from the tactics of his trial counsel. In *Cruzado v. People of Puerto Rico,* 210 F.2d 789, 791 (1st Cir. 1954), Chief Judge Magruder wrote for the court: "If the accused, being present, manifests no dissent, it is usually fair to assume that he approves of, or at least acquiesces in, the decisions taken in open court in his behalf by his counsel."

*Id.* at 629.

Defense counsel made a tactical decision to go forward with the trial. Petitioner, by

not objecting as he was informed he could do, acquiesced in that decision and effectively waived his right to a public trial as to that portion of the case which had already been completed.

*For the foregoing reasons, the judgment of the district court denying the petition for writ of habeas corpus is affirmed.*