# IN THE COURT OF APPEALS OF IOWA

No. 18-0511
Filed February 5, 2020

**STATE OF IOWA,**
　　　Plaintiff-Appellee,

**vs.**

**DAVID L. LEVY JR.,**
　　　Defendant-Appellant.
_____

Appeal from the Iowa District Court for Scott County, Henry W. Latham II, Judge.

The defendant appeals from his convictions of murder in the second degree and felon in possession of a firearm. **AFFIRMED.**

Martha J. Lucey, State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Benjamin Parrott, Assistant Attorney General, for appellee.

Heard by Bower, C.J., and Greer and Ahlers, JJ.

**GREER, Judge.**

David Levy Jr. appeals from his convictions of murder in the second degree and felon in possession of a firearm. Levy maintains he received ineffective assistance from trial counsel. Specifically, he maintains trial counsel provided ineffective assistance by failing to object to 1) multiple portions of the trial being closed to the public, 2) a jury instruction—based on a model instruction—advising the jury it could consider Levy's out-of-court statements "just as if they had been made at trial," and 3) prosecutorial error during the State's rebuttal argument. In his pro se brief,[1] Levy joins the claims raised by counsel and also appears to argue he should have been convicted of voluntary manslaughter instead of murder in the second degree.[2]

---

[1] Levy raises claims of ineffective assistance on direct appeal and, while represented by counsel, filed a pro se and pro se reply brief. *See* Iowa Code §§ 814.6A(1) (prohibiting a defendant who is represented by counsel from filing any pro se document), 814.7 (2020) (prohibiting the court from deciding claims of ineffective assistance on direct appeal). Because the judgments and sentences in the underlying case were filed before July 1, 2019, the amended code sections do not apply to this appeal. *See State v. Macke*, 933 N.W.2d 226, 228 (Iowa 2019) ("[W]e hold Iowa Code sections 814.6 and 814.7, as amended, do not apply to a direct appeal from a judgment and sentence entered before July 1, 2019."); *see also State v. Purk*, No. 18-0208, 2019 WL 5790875, at *7 n.8 (Iowa Ct. App. Nov. 6, 2019) (extending the reasoning of *Macke* to Iowa Code section 814.6A(1) and concluding defendants represented by counsel may file pro se briefs in direct appeals where the judgment and sentence was entered before July 1, 2019).

[2] Levy argues the prosecution "pursued a conviction without evidence that fit[] the components and possessed the elements of murder in the second degree." He lays out the statutory definition of voluntary manslaughter and, in his conclusion, asks this court to reverse his conviction and "grant a limited remand" so the district court can "look at the underlying charges, where the elements and components are more suitable for the crime."

**I. Facts and Prior Proceedings.**

In March 2017, Levy was charged by trial information with murder in the first degree and possession of a firearm by a felon. Levy pled not guilty.

Voir dire for Levy's jury trial began January 29, 2018. Multiple portions of voir dire took place in the judge's chambers with the attorneys, the defendant, and sometimes a juror present—no members of the public or media. Four prospective jurors were brought back into chambers to discuss their potential knowledge of the case after they revealed previously hearing about it. Two potential jurors asked to speak privately with the court in chambers—one discussed a child care issue and did not know if he could remain on the jury while the other expressed that he had already decided Levy's guilt. Two other potential jurors spoke in private chambers raising sensitive, private issues arguably impacting their service, including their experience being victims or family members of victims to previous crimes. And, after the State exercised its final strike, Levy raised a *Batson* challenge—heard and decided in chambers.

At the start of the trial Davenport police officers testified that a 911 call for shots fired came in at approximately 9:50 p.m. on February 17, 2017. When the first officers arrived at the scene a couple of minutes later, they found Lasabian Walker laying on the ground with multiple gunshot wounds; Walker did not have a pulse and was not breathing. Cassila Battie—Walker's fiancée—was near Walker, repeatedly screaming, "David did it." After Walker left by ambulance to the hospital, where he was ultimately pronounced dead, police canvassed the area. They recovered a revolver on the ground covered by a pile of leaves a few houses down. Meanwhile, investigators removed four bullets from Walker's body and

recovered a fifth on the staircase near where Walker was laying. Later testing confirmed three of the five bullets came from the revolver. Though the other two bullets could have been shot from the revolver, the damage to them made the results inconclusive.

Shallum Davenport, a close friend of Walker's and Battie's, testified that he was with Walker and Battie on February 17. Walker and Battie picked Davenport up from a friend's house, then the three of them met up with Levy and proceeded to the home of Levy's mother, Gloria. Levy and Battie, who are first cousins,[3] began arguing in the yard outside Gloria's home; Walker was still in the van. Davenport went and got Walker, and then they both joined Levy and Battie in the yard. Davenport testified "shooting started going off" but denied knowing who was doing the shooting. He also denied recognizing either the recovered gun or Walker in photos shown to him, talking to police the night of the incident, or knowing Walker had died as a result of the shooting. The State asked the court for a recess to get a recording of the interview Davenport gave to the police to either refresh Davenport's memory or impeach him with his prior statements.

Next and before any other testimony, the prosecutor informed the court outside the presence of the jury that Davenport alerted her he had been threatened. The prosecutor asked the court to close the courtroom so Davenport could be brought back in and asked about the threat. Defense counsel did not object.

---

[3] Levy's mother is Battie's aunt.

Initially Davenport denied saying he had been threatened; he maintained he had a headache and was unable to remember things from the night of February 17. But after the lunch break, the prosecutor informed the court that Davenport had asked if the courtroom could be closed so he could tell the court the truth about the threat. The courtroom remained closed, and Davenport again took the stand. He reported he had been threatened; someone called the mother of his child that morning before Davenport began testifying and told her "that somebody in [the courtroom], they [were] waiting for [him] to do what [he] was supposed to do and they [were] going to kill [him] and attack [his] family." He understood it to be a threat regarding his testimony and stated it was affecting his ability to testify truthfully. Davenport said he could tell the truth about what took place on February 17 if the courtroom remained closed. When asked, Davenport indicated he did not have his own cell phone, so people often had to communicate with him by calling others and having a message relayed.

The State moved to have the courtroom remain closed during Davenport's testimony. Defense counsel responded, "Under the circumstances, I don't know that we're in a position to resist that, Your Honor." The court granted the State's motion, and the jury was brought back in.

The second time, Davenport testified he recognized Walker in the photo shown to him. He stated Battie and Levy were arguing about something and Levy pulled out a gun, which Davenport identified as the same gun the police recovered on February 17. Davenport indicated that after Levy pulled out the gun, Davenport went and got Walker from the van. Once Walker reached the spot of the argument, Walker unsuccessfully attempted to take the gun from Levy. As Walker stumbled

backward, Levy shot him five times. After the first shot, Walker was "[a]sking for help. Like hissing and falling backwards." Davenport fled then, as he was concerned Levy might shoot him as well. After he took off, he saw Levy ducking between some cars with the gun in his hand. Davenport eventually rounded back to Gloria's house, where he saw Battie crying over Walker. Police officers stopped Davenport and transported him to the police station to be interviewed. Davenport did not initially tell police that Levy shot Walker, but he did after the police informed him Walker was dead.

Battie testified next.[4] She stated she was driving her van, with Walker and Davenport riding as passengers in the row of seats behind her, when she saw Levy near his mother's home. Levy got into the front passenger seat of Battie's vehicle, and she began driving. Then Walker and Levy "started having words with each other about [Levy] coming and taking stuff from [Battie's] house." Levy indicated he wanted out of the vehicle, and Battie drove back to Gloria's house. Once they arrived, Battie told Levy she was going to get out and tell his mother that he stole things from Battie's home. The pair did not make it to the front door; Battie and Levy were still arguing in the yard by the front of the house when Levy pulled out a gun and pointed it at her. Then Battie saw Walker running toward her. When he reached them, Walker and Levy "started having words about [Levy] getting the gun off of" Battie. Levy asked Battie if she loved Walker more than she loved her family. Walker tried to get the gun away from Levy, but he was unable. Then, in her

---

[4] The transcript of the proceedings is silent as to whether the courtroom was reopened after Davenport's testimony, and the next indication the courtroom was open took place after Battie completed her testimony.

version, she described that Walker "jumped back like he was trying to—fixing to run, but before he could do any of that, the gun just went off, pow." Walker was hit by the first bullet and went down. Battie tried to help Walker by putting pressure where the blood was coming from, "[b]ut [Levy] walked over and shot him some more. Five, six more times." Walker never got back up. Battie testified she told the police that Levy was the shooter and which direction he had run once they arrived on the scene. When asked, Battie admitted she originally lied to the police about how she got to Gloria's home—Battie did not have a license to drive—and that she told police Levy stole rent money rather than admitting it was drugs he stole from her home.

On cross-examination, defense counsel asked Battie if the argument in the van "got physical," which Battie denied. Defense counsel then read part of Battie's deposition, during which she stated Walker, Davenport, and Levy were "getting all in each other's face, arguing, argue, swinging." Defense counsel also asked if Levy had tried to jump out of the van to get away from Davenport and Walker, noting Battie had testified at the deposition, "Let me out of the car. So we like don't just jump out of the car, like you crazy, you know, you got—he know he got cerebral palsy, why is he trying to dive out of the car." At trial Battie testified Levy said he was going to get out of the van but he never attempted to jump out.

After several more witnesses, the courtroom was again closed to the public. One of the jurors informed the court that as she walked back into the courthouse after lunch, someone behind her yelled, "Find [unintelligible] innocent." The person, who the juror believed was male based on their voice, said it "like three times." The court, by written interrogatory, confirmed none of the other jurors had

been approached. Afterward, the State asked the court to close the courtroom for the remaining term of the proceedings. Defense counsel initially indicated they would not resist, but after a short recess to discuss the issue with Levy, changed their position. The State then withdrew the request to have the courtroom closed, and the courtroom was reopened to the public.

The State admitted into evidence and then played for the jury a video showing an interview police conducted with Levy during the early morning hours of February 18, 2017. During the interview, Levy denied knowing Davenport or Walker; he also denied knowing anything about the shooting. Despite repeated questions if he was bullied or in a fight that night, Levy consistently stated he was not. Levy initially denied having ever seen the gun that was recovered under the leaves, but after the officer asked if his fingerprints might be found on it, Levy mentioned that he had touched a gun that looked like it at a gun store. Similarly, when asked if testing him might reveal gun powder residue, Levy indicated that he probably fell in some.

After the State rested, Levy testified in his own defense. Levy described his birth condition of cerebral palsy, which affects his lower extremities and how he walks. Levy admitted being dishonest with police when they questioned him, stating he was afraid for his and his family's safety. According to Levy, he did not have a plan to meet up with Battie, Davenport, and Walker on February 17, but the trio came looking for him. After he saw Battie drive past in her van, he went to get in without realizing Davenport and Walker were in the row behind the driver's seat. As soon as he entered, Davenport and Walker immediately attacked him, so he jumped out of the van and tried to make it to his mother's house. The trio

intercepted him in his mother's yard before he made it inside. Walker hit him, and he fell to the ground. He yelled "help" a few times, but the neighbors were playing music and no one seemed to hear him. Levy asked them to leave him alone, but they did not. "The gun came out," and Walker tried to get it away from Levy. Levy fell back, and the gun "just went off." Walker "just kept coming, and [Levy] [didn't] know what happened after that." Levy testified both Davenport and Battie took off running; he dropped the gun in front of his mother's house and did not see it again. He did not know how Walker came to be shot five times or how the gun ended up below a pile of leaves a few houses down. His mother did not answer the door, so he walked toward the street "so somebody could see [him]." He was still walking when police, responding to the 911 call for the shooting, came upon him and placed him in the squad car so they could talk to him about what he may have witnessed.

The jury convicted Levy of the lesser-included offense of murder in the second degree and felon in possession of a firearm. Levy appeals.

## II. Discussion.

### A. Ineffective Assistance of Trial Counsel.

Levy raises three claims of ineffective assistance of trial counsel. He maintains trial counsel provided ineffective assistance by failing to object to 1) multiple portions of the trial being closed to the public, 2) a jury instruction—based on a model instruction—advising the jury it could consider Levy's out-of-court statements "just as if they had been made at trial," and 3) prosecutorial error during the State's rebuttal argument.

"For his ineffective-assistance-of-counsel claim to succeed, [Levy] 'must prove by a preponderance of the evidence that (1) his counsel failed to perform an essential duty, and (2) prejudice resulted.'" *State v. Tate*, 710 N.W.2d 237, 240 (Iowa 2006) (citation omitted).

"Under the first prong, we measure counsel's performance against the standard of a reasonably competent practitioner." *State v. Thorndike*, 860 N.W.2d 316, 320 (Iowa 2015) (altered for readability). "It is presumed the attorney performed his or her duties competently, and the claimant must successfully rebut this presumption by establishing by a preponderance of the evidence that counsel failed to perform an essential duty." *Id.* "We assess counsel's performance 'objectively by determining whether [it] was reasonable, under prevailing professional norms, considering all the circumstances.'" *Id.* (alteration in original) (quoting *State v. Lyman*, 776 N.W.2d 865, 876 (Iowa 2010)).

"Under the second prong, the claimant must establish that prejudice resulted from counsel's failure to perform an essential duty." *Id.* "The claimant must show 'counsel's errors were so serious as to deprive [him or her] of a fair trial.'" *Id.* (alteration in original) (citation omitted). The effect of the failure to perform an essential duty "must be affirmatively demonstrated by showing 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* (citations omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "The ultimate question is 'whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.'" *Id.* (citations omitted).

**1. Closing Trial to the Public.**

Levy maintains his constitutional right to a public trial was violated several times throughout the proceedings. *See* U.S. Const. amend VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ."), Iowa Const. art. I, § 10 ("In all criminal prosecutions, and in cases involving the life, or liberty of an individual the accused shall have a right to a speedy and public trial by an impartial jury . . . ."); *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 504–12 (1984) (concluding the guarantees of open public proceedings in criminal trials include voir dire examination of prospective jurors).

While "the right to an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information," "[s]uch circumstances will be rare, . . . and the balance of interests must be struck with special care." *Waller v. Georgia*, 467 U.S. 39, 45 (1984). The Supreme Court established stringent criteria for the closing of a trial:

> 1. The party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced;
> 2. the closure must be no broader than necessary to protect that interest;
> 3. the trial court must consider reasonable alternatives to closing the proceedings; and
> 4. the trial court must make findings adequate to support the closure.

*State v. Schultzen*, 522 N.W.2d 833, 836 (Iowa 1994) (quoting *Waller*, 467 U.S. at 48). Here, defense counsel did not resist the closing of the trial to the public,[5] so

---

[5] Defense counsel resisted the closing of the trial when the State moved to close the remainder of the proceedings after the juror was approached in the parking lot. But once defense counsel resisted, the State withdrew its motion, and the

the State was never asked to discuss the criteria nor was the court asked to rule on them.

Levy maintains the State would be unable to satisfy this criteria and therefore the closure was improper and prejudicial. In other words, Levy asks us to find that any improper closing of the trial to the public results in a structural error that requires automatic reversal. *See Lado v. State*, 804 N.W.2d 248, 252 (Iowa 2011) ("Structural errors are not merely errors in a legal proceeding, but errors 'affecting the framework within which the trial proceeds.' . . . Under these circumstances, '[n]o specific showing of prejudice [is] required' as the criminal adversary process itself is 'presumptively unreliable.'" (alterations in original except omitted text) (citations omitted)).

But the Supreme Court has considered this issue and concluded otherwise. In *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1905 (2017), during the underlying state criminal trial, "the courtroom was occupied by potential jurors and closed to the public for two days of the jury selection process. Defense counsel neither objected to the closure at trial nor raised the issue on direct review." The case came to the Supreme Court "on the assumption that, in failing to object, defense counsel provided ineffective assistance." *Weaver*, 137 U.S. at 1905. The Court noted:

> In the direct review context, the underlying constitutional violation—
> the courtroom closure—has been treated by this Court as a
> structural error, *i.e.,* an error entitling the defendant to automatic
> reversal without any inquiry into prejudice. The question is whether

proceedings remained open. Defense counsel did not object to the proceedings occurring outside the public during voir dire, the discussion with Davenport about the threat against him and then Davenport's testimony to a closed courtroom, or the discussion with the juror who reported being approached in the parking lot.

invalidation of the conviction is required here as well, or if the prejudice inquiry is altered when the structural error is raised in the context of an ineffective-assistance-of-counsel claim.

*Id.*

The right to a public trial, though structural, is subject to exceptions. *Id.* at 1909. "[W]hile the public-trial right is important for fundamental reasons, in some cases an unlawful closure might take place and yet the trial still will be fundamentally fair from the defendant's standpoint." *Id.* at 1910. In other words, there may be a structural error which does not require reversal of a defendant's conviction. *See, e.g., id.*; *Krogmann v. State*, 914 N.W.2d 293, 324 (Iowa 2018) (considering whether a case involving an unpreserved structural error at trial challenged via ineffective assistance claim in postconviction-relief (PCR) proceedings required a showing of *Strickland* prejudice but concluding prejudice should be presumed in a PCR proceeding for the type of error presented in the case).

"[I]n the case of a structural error where there is an objection at trial and the issue is raised on direct appeal, the defendant generally is entitled to 'automatic reversal' regardless of the error's actual 'effect on the outcome.'" *Id.* at 1910. But "when the defendant does not preserve a structural error on direct review but raises it later in the context of an ineffective-assistance-of-counsel claim," "[t]o obtain relief on the basis of ineffective assistance of counsel, the defendant as a general rule bears the burden to meet" the general ineffective-assistance-of-counsel standards: that counsel failed to act competently and *Strickland* prejudice resulted. *Id.*

"That said, the concept of prejudice is defined in different ways depending on the context in which it appears"; "the prejudice inquiry is not meant to be applied in a 'mechanical' fashion." *Id.* at 1911 (citing *Strickland v. Washington*, 466 U.S. 668, 694 (1984). "[W]hen a court is evaluating an ineffective-assistance claim, the ultimate inquiry must concentrate on 'the fundamental fairness of the proceeding.'" *Id.* (citation omitted). In *Weaver*, the defendant maintained relief should be granted "even if there is no showing of a reasonable probability of a different outcome, if the convicted person shows that attorney errors rendered the trial fundamentally unfair." *Id.* The Court assumed without concluding that the defendant could show prejudice either by establishing "a reasonable probability of a different outcome in his or her case or . . . that the particular public-trial violation was so serious as to render his or her trial fundamentally unfair." *Id.*

Levy does not try to establish either that the outcome of his trial would have been different or that the closed trial was so serious as to render his trial fundamentally unfair. He relies on the idea that *Weaver* does not apply in his case (since he raises his claim of ineffective assistance on direct appeal rather than PCR) and concludes that a finding of a structural error requires automatic reversal. We disagree. While the procedural history of *Weaver* is different than the case before us, the requirement the defendant establish prejudice rests on whether the public-trial issue was preserved in the trial court. *See id.* at 1912 ("The reason for placing the burden on the petitioner in this case, however, derives both from the nature of the error . . . and the difference between a public-trial violation preserved and then raised on direct review and a public-trial violation raised as an ineffective-assistance-of-counsel claim."). *But see id.* ("Furthermore, when state or federal

courts adjudicate errors objected to during trial and then raised on direct review, the systemic costs of remedying the error are diminished to some extent. That is because, if a new trial is ordered on direct review, there may be a reasonable chance that not too much time will have elapsed for witness memories still to be accurate and physical evidence not to be lost."). Because "the development of the ineffective-assistance claim in the appellate brief [is] insufficient to allow its consideration," we neither decide nor outright reject this claim. *State v. Harris*, 919 N.W.2d 753, 754 (Iowa 2018).

Levy also claims his right to a public trial under the Iowa Constitution was violated; he asks us to apply a different standard in deciding this ineffective-assistance claim than the standard we apply under the Federal Constitution, arguing we should presume prejudice and automatically reverse when the defendant shows structural error under the Iowa Constitution.

Our supreme court has not yet recognized the failure to object to the closing of criminal proceedings as a structural error. *See Lado*, 804 N.W.2d at 252 ("We have recognized structural error occurs when: (1) counsel is completely denied, actually or constructively, at a crucial stage of the proceeding; (2) where counsel does not place the prosecution's case against meaningful adversarial testing; or (3) where surrounding circumstances justify a presumption of ineffectiveness, such as where counsel has an actual conflict of interest in jointly representing multiple defendants."); *see also Krogmann*, 914 N.W.2d at 326 (finding structural error when the district court unlawfully froze the defendant's assets, which defense counsel did not properly challenge, violating the defendant's constitutional right to be the master of his own defense).

But we need not decide this issue now. We choose to preserve Levy's claims for further development of the record on PCR. *See Tate*, 710 N.W.2d at 240 ("Ordinarily, we do not decide ineffective-assistance-of-counsel claims on direct appeal. . . . Only in rare cases will the trial record alone be sufficient to resolve the claim on direct appeal." (citations omitted)). In *Weaver*, the Supreme Court assumed without deciding that failure to object to the closing of the courtroom constituted failure to perform an essential duty. 137 S. Ct. at 1912. But we do not make the same assumption. While a defendant has a constitutional right to a public trial, they may choose to forego that right. *See Singer v. United States*, 380 U.S. 24, 35 (1965) ("[A]lthough a defendant can, under some circumstances, waive his constitutional right to a public trial, he has no absolute right to compel a private trial."); *Martineau v. Perrin*, 601 F.2d 1196, 1199 (1st Cir. 1979) ("It is also firmly established that a criminal defendant can 'waive his constitutional right to a public trial.'" (citation omitted)). Our record is devoid of any indication whether Levy supported or was opposed to the closing of the courtroom. We preserve Levy's claim of ineffective assistance based on the failure to object to the closing of the courtroom for possible PCR proceedings.

**2. Jury Instruction.**

Levy maintains trial counsel provided ineffective assistance by failing to object to a jury instruction—based on a model instruction—advising the jury it could consider Levy's out-of-court statements "just as if they had been made at trial." Specifically, the instruction stated:

> Evidence has been offered to show that the Defendant made statements at an earlier time and place.

If you find any of the statements were made, then you may consider them as part of the evidence, just as if they had been made at this trial.

Levy maintains this is an improper statement of law.

This court has addressed this instruction several times before and found it to be a correct statement of the law. *See State v. Garcia*, No. 17-0111, 2018 WL 3913668, at *4 (Iowa Ct. App. Aug. 15, 2018) (collecting cases). However, the determination that the instruction is a correct statement of the law has not been without disagreement. *See State v. Payne*, No. 16-1672, 2018 WL 1182624, at *11–12 (Iowa Ct. App. Mar. 7, 2018) (Tabor, J., dissenting) (asserting the instruction is an incorrect statement of law). We note that the language challenged in this case no longer appears in the model instruction but that change occurred after Levy's trial.[6]

In spite of any disagreement over the model instruction, the controlling precedent at the time of trial was that the instruction as given was a correct statement of the law. Therefore, even if defense counsel had objected to the

---

[6] Iowa Criminal Jury Instruction 200.44, which the complained-of jury instruction is based upon, was revised in June 2018. The model instruction now states:

> **200.44 Statements By The Defendant.** Evidence has been offered to show that the defendant made statements at an earlier time and place.
>
> If you find any of the statements were made, then you may consider them as part of the evidence.
>
> *You may also use these statements to help you decide if you believe the defendant. You may disregard all or any part of the defendant's testimony if you find the statements were made and were inconsistent with the defendant's testimony given at trial, but you are not required to do so. Do not disregard the defendant's testimony if other evidence you believe supports it or you believe it for any other reason.
>
> . . . .

*The last paragraph should be used only if the defendant testifies.

instruction, it would have been appropriate for the court to overrule the objection. Since defense counsel did not have a duty to object based on the law at the time of trial, Levy cannot establish ineffective assistance of counsel on this issue. *See State v. Brubaker*, 805 N.W.2d 164, 171 (Iowa 2011) ("We will not find counsel incompetent for failing to pursue a meritless issue."); *State v. Fountain*, 786 N.W.2d 260, 266 (Iowa 2010) ("The claim fails if the defendant is unable to prove either element of this test.").

### 3. Prosecutorial Error.

Levy maintains the prosecutor committed prosecutorial error during the State's rebuttal closing argument.[7]

Because Levy raises this claim of prosecutorial error under the framework of ineffective assistance, "our first step is to assess whether the record demonstrates, as a matter of law, the existence or absence of a meritorious due process violation." *Graves*, 668 N.W.2d at 869. "Thus, we must consider whether the prosecutor was guilty of misconduct in the particulars identified by [the defendant] and whether the record shows [the defendant] was prejudiced, i.e., denied a fair trial." *Id.* If Levy is able to establish both elements of his due process claim, he "will have proved that the assertion of such claim at the time of the

---

[7] Claims relating to a prosecutor's behavior at trial have historically been referred to as prosecutorial misconduct.

However, our supreme court adopted a distinction "between incidences of prosecutorial error and prosecutorial misconduct" and noted "[a] prosecutor who has committed error should not be described as committing misconduct." *State v. Schlitter*, 881 N.W.2d 380, 393–94 (Iowa 2016). We apply the same multi-factor test outlined in *State v. Graves*, 668 N.W.2d 860, 869 (Iowa 2003), either way. *Id.* at 394. Thus, as Levy has characterized the statements as prosecutorial error, we do the same.

prosecutor's misconduct would have had merit." *Id.* at 870. Only then do we proceed to consider whether his claim can meet the requirements of ineffective assistance. *See id.*

"If it is determined defense counsel failed to raise a meritorious issue, we must then consider whether an attorney performing within the range of normal competency would have made an objection and/or requested a mistrial." *Id.* "If there is no possibility that trial counsel's failure to act can be attributed to reasonable trial strategy, then we can conclude the defendant has established that counsel failed to perform an essential duty." *Id.* "If trial counsel's conduct might be characterized as a reasonable trial tactic, then [the] ineffective-assistance claim must be preserved for trial in a possible postconviction relief action." *Id.* "[S]hould the defendant's claim survive to this point, [we] assess whether the record permits a determination of the prejudice prong of the ineffective-assistance claim." *Id.*

Levy challenges several statements in the following statements made by the prosecutor on rebuttal.

> They want to nitpick [Battie's] inconsistencies and have you believe that she is being dishonest, she is the dishonest one, that you can't believe anything that she said. But again remember what those inconsistencies were. Yeah, she didn't want to admit initially she had driven the van. She was afraid that she would get in trouble for driving. Yeah, she didn't want to admit that that fight might have been about drugs, so again she is trying to protect her fiancé in his death.
> *But you do not get any more dishonest than saying you don't even know Lasabian Walker, that you don't even know Shallum Davenport. You don't get any more dishonest or inconsistent by saying over 20 times in a matter of an hour interview that you don't know nothing and that you didn't see nothing.*
> . . . .
> *You don't get any more dishonest or inconsistent by saying I never seen that gun.* I don't play with guns. I was walking to the store that night right before the shots. I was walking home—or

walking away from the store when I heard the shots. Then my mom gave me a ride home from the store, dropped me off at a girl's house by Sav-A-Lot. I hadn't seen [Battie] since 6:00 a.m. that morning. Then he said he later saw her as they passed by each other in the front of the house. I ran after I heard the shots. I can't run. *You don't get any more dishonest or inconsistent than that.* And he wants you to believe what he says about what happened in that yard or in that van? He wants you to believe that it was self-defense?

     *You can't believe anything that he says.* And there is a big difference between saying that you don't know nothing or you didn't see nothing like he did plenty of times and *making stuff up. And that's exactly what this Defendant did. He did it with Detective Thomas in that interview and he did it on Friday when he testified. . . .*

     . . . .

. . . They asked about that interview with Detective Thomas and does it have any value at all. They mentioned something about Detective Thomas just making stuff up. I mean, you have your own recollection of the video. What's he making up? He's not making anything up. He's using an interview technique that they use that when a person is sitting there saying "I don't know nothing, I didn't see nothing" multiple times, that they will try to throw something out, "Well, what if we test this for fingerprints, are we going to see your fingerprints are on here? What about residue powder testing, if you didn't shoot the gun, are we going to see anything about that?" And I think after the progression of that interview and you start to see [Levy's] answers change, I think you start to learn why these questions are asked by a detective. Because it does start to elicit some answers. "I might have fallen in some gunpowder. I might have touched a gun like that at Gander Mountain once."

     So that's why he asks it. Because it does, in fact, work. Even if it's a *ridiculous response*, it does start to elicit a response. Because a guilty person sits there and starts to worry, oh, I got to start coming up with some answers to some of this just in case they find it. Got to be able to explain that away. That's why they do it. And it certainly has value. *Because it shows you that the Defendant isn't being honest.*[8]

(Emphasis added.)

We will not decide Levy's ultimate claim of ineffective assistance on this

record. Even assuming the prosecutor's statements constituted prosecutorial error

---

[8] The portion in italics are the specific phrases and sentences Levy has challenged as prosecutorial error; we include the rest of the statement as context.

and resulted in a due process violation, our record is silent as to defense counsels' decision not to object. As we have often said before, we prefer to preserve claims of ineffective assistance for postconviction-relief proceedings. *See, e.g.*, *State v. Clay*, 824 N.W.2d 488, 494 (Iowa 2012). "A primary reason for doing so is to ensure development of an adequate record to allow the attorney charged to respond to the defendant's claims." *Brubaker*, 805 N.W.2d at 170. We preserve this claim.

### B. Pro Se Claim.

While we have considered Levy's pro se briefs as part of his appeal, we cannot address his claims insofar as they are different than those made by counsel. It appears Levy may be claiming insufficient evidence to support his conviction of murder in the second degree, but he does not challenge his conviction under any legal theory and does not explain how this alleged issue is preserved for our review. Additionally, he makes no cite to the record or authority in his supplemental brief.

Because he makes no cognizable legal claim and his supplemental brief fails to comport with the appellate rules of procedure, we do not consider any of the issues further. *See In re Estate of DeTar*, 572 N.W.2d 178, 181 (Iowa Ct. App. 1997) ("We are not bound to consider a party's position when the brief fails to comply with the Iowa Rules of Appellate Procedure."); *see also Metro. Jacobson Dev. Venture v. Bd. of Review of Des Moines*, 476 N.W.2d 726, 729 (Iowa Ct. App. 1991) ("We do not utilize a deferential standard when persons choose to represent themselves. . . . Rather, all are expected to act with equal competence.").

**III. Conclusion.**

Because the jury instruction regarding his testimony is a correct statement of law, Levy's claim of ineffective assistance regarding the failure to object fails. We cannot decide on direct appeal Levy's claims of ineffective assistance involving his right to a public trial or his claim of prosecutor error, so we preserve them for possible postconviction-relief proceedings. We cannot reach the merits of Levy's pro se claim. We affirm.

**AFFIRMED.**