# IN THE SUPREME COURT OF IOWA

No. 07–1999

Filed January 8, 2010

**STATE OF IOWA,**

    Appellee,

vs.

**JUNE BETTY LYMAN,**

    Appellant.

---

Appeal from the Iowa District Court for Woodbury County, Duane E. Hoffmeyer, Judge.

The defendant appeals her conviction for second-degree murder. **AFFIRMED**.

Mark C. Smith, State Appellate Defender, and Martha J. Lucey, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Jean C. Pettinger, Assistant Attorney General, Patrick Jennings, County Attorney, and Terry C. Ganzel, Assistant County Attorney, for appellee.

**WIGGINS, Justice.**

The defendant appeals from her conviction for second-degree murder alleging that the district court erred in holding she was competent to stand trial and by failing to instruct the jury that murder in the second degree is a specific intent crime. She also claims her trial counsel provided ineffective assistance of counsel by failing to redact and/or object to the introduction of evidence depicting the defendant's repeated invocations of her right to remain silent as well as failing to object to prosecution references to these statements during closing arguments. In this appeal, we find the district court correctly determined the defendant was competent to stand trial and that she was not entitled to a specific intent instruction. We also find the record inadequate to decide her ineffective-assistance-of-counsel claim. Accordingly, we affirm her conviction.

### I. Background Facts and Proceedings.

June Lyman dropped out of high school and married Bob Auen when she was fifteen years old. She had three daughters and one son during the course of the marriage. A court dissolved her marriage after seven or eight years. In 1967 June married Leo Lyman, Sr. Their relationship was rocky. During the marriage, Leo allegedly sexually assaulted June's three daughters from her first marriage. In May 1970 Leo was charged with three counts of lascivious acts with a child but the case was later dismissed for lack of prosecution. The couple divorced in July 1979 but later remarried in November. The couple divorced for a second time in 1998; however, they remarried a third time sometime before 2006. In 2004, Sandra, one of June's three daughters, committed suicide causing June to experience increased depression and anxiety.

At approximately 8:14 p.m. on May 15, 2006, June called her daughter-in-law and asked to speak to her son. He was not home, so she hung up. Seven minutes later, an anonymous female called 911, gave an address, requested police assistance, and reported a dead body in the residence. The phone used to make the call was listed under June's name and the address provided was her residence. At 8:31 p.m., June called her daughter-in-law and again asked to speak to her son. At 8:33 p.m., June called her daughter-in-law for a third time, again asked to speak to her son, and then stated, "oh, God, I just shot Dad" and hung up.

Deputy Todd Peterson arrived at June's residence around the time June made the last call to her daughter-in-law. Upon entering the residence, he noticed Leo lying on the floor on his right side, facing the door, with blood coming from his mouth. He also saw a revolver lying on the floor directly behind Leo. The police later identified the revolver as the murder weapon. While Peterson was checking Leo's vitals, June entered the room, stood over Leo, and told Peterson that he deserved what he got, he was a child molester, and she hoped he was dead. June further stated that he should have been dead a long time ago, she had shot him, and her fingerprints were all over the gun.

A volunteer EMT, who was on the scene to administer first aid, confirmed Leo was dead. He had been shot four times, with the lethal shot striking him in the left lower chest. While working on Leo, the EMT heard June say, "yes, I did it. I shot him." At the scene, Peterson observed that June spoke coherently, appeared to understand what was going on, and at one point even asked to make a phone call so that someone could take care of her dog. Peterson smelled alcohol in the residence and on June's breath. He noticed there were numerous beer

cans in the kitchen. He also thought June's words were not slurred, but her balance was a little unsteady. June admitted to him that she was intoxicated.

Peterson read June the *Miranda* warning at approximately 8:37 p.m. Peterson observed that June appeared to understand her rights when he read them to her. A short time thereafter, she requested an attorney. Peterson allowed June to call her daughter-in-law before transporting her to the law enforcement center. During the transport, June voluntarily made numerous incriminating statements that were recorded by the patrol car's video recording system, such as, "I shot the motherfucker," "I've already admitted to you I killed him," and "I shot the fucker. Hey, and I can't deny it. My fingerprints are on the gun." During the transport, June also repeatedly referenced her right to an attorney and her right to remain silent.

Upon arriving at the law enforcement center, Deputy Todd Wieck walked June to an office. June appeared to act normal, seemed to know what was going on, did not slur her words, and did not appear intoxicated. Wieck placed June in an office furnished with videotape equipment. Another deputy informed her that she was being recorded and reread the *Miranda* warning. After hearing the *Miranda* warning for a second time, June again stated, "I want an attorney." Due to her request, the officers did not question her. However, rather than remaining silent, June continued to voluntarily make incriminating statements such as, "I shot the gun," "I never thought it was that easy to die or I would have done it a long time ago," and "[w]ell, it's not self-defense actually. I wasn't threatened, but I had a reasonable reason." At the same time, June continued to request an attorney and state that she probably should not be saying anything.

While at the law enforcement center, investigators performed a blood-alcohol-content test on June. A deputy administered a breath test at approximately 12:32 a.m. to determine June's blood-alcohol content. June admitted to drinking ten beers and stated she felt buzzed at the time the test was administered. The test's final reading confirmed that June's blood-alcohol content was 0.133. Using a standard absorption rate, June's blood-alcohol content was approximately 0.213 at the time she called 911. Moreover, June also had prescriptions for the drugs Lipitor, Wellbutrin XL, Alprazolam, Naproxen, Daltiazem, Premarin, and Triamterene at the time of the shooting.

The State charged June with murder in the first degree. June filed a motion requesting the district court determine whether she was competent to stand trial. She claimed an inability to remember and recall facts surrounding the shooting, making her unable to assist her attorneys in preparing her defense and rendering her incompetent pursuant to Iowa Code section 812.3 (2005).[1]

After hearing testimony from experts on both sides, the district court concluded June had failed to carry her burden of proof to show her incompetence. Therefore, the presumption of June's competency prevailed. Accordingly, the court denied the motion and set the matter for trial.

June then filed a motion for the adjudication of a law point, seeking a determination from the court regarding whether second-degree murder, under Iowa Code section 707.3, is a specific intent crime. The district court stated its preliminary observation and research indicated second-degree murder was not a specific intent crime. However, the

---

[1]All references to the Iowa Code are to the 2005 Code unless otherwise noted.

court deferred action on the motion to the time and place June made her record on the jury instructions.

At trial, the State played the full video recordings of June's transport to the law enforcement center as well as her later detention in an office located within the center. At no point during the presentation of this evidence did her attorneys object or ask to redact any portion of the videos.

At the conclusion of the evidence, June renewed her argument that because assault, a specific intent crime, is a lesser-included offense of second-degree murder, the specific intent required for an assault must be proven to establish second-degree murder. Therefore, June argued that to establish second-degree murder the State was required to prove beyond a reasonable doubt that she had the specific intent to commit an assault even though the State need not establish a specific intent to kill. The district court denied June's motion and found that second-degree murder is a general intent crime.

During the State's closing argument, the prosecuting attorney referred three times to June's invocation of her right to remain silent by requesting an attorney. June's counsel did not object to these references. The jury returned a unanimous verdict finding June guilty of the lesser-included offense of murder in the second degree. June appeals.

**II. Issues.**

In this appeal, June raises three issues. First, we must determine whether the district court's determination that June was competent to stand trial was correct. Next, we must decide whether the district court properly instructed the jury with regard to the elements of murder in the second degree. Finally, we must consider whether June's trial counsel

was ineffective for failing to redact and/or object to the introduction of the video evidence depicting June's repeated invocations of her right to remain silent by requesting an attorney and for failing to object to references concerning these invocations made in the prosecutor's closing argument.

### III. Competence to Stand Trial.

**A. Standard of Review.** June claims the standard of review is de novo. The State claims the standard of review is for correction of errors at law and that we are bound by the district court's finding of competency, if it is supported by substantial evidence. June and the State cite Iowa authority for their respective positions. Accordingly, to determine the proper standard of review, it is necessary to review the applicable cases and statutes pertaining to competency.

The trial of an incompetent defendant in a criminal matter violates the defendant's due process rights as guaranteed by the Fourteenth Amendment to the United States Constitution. *Cooper v. Oklahoma*, 517 U.S. 348, 354, 116 S. Ct. 1373, 1376, 134 L. Ed. 2d 498, 505–06 (1996). Therefore, whether a defendant is competent to stand trial implicates a constitutional right. *State v. Edwards*, 507 N.W.2d 393, 395 (Iowa 1993).

Prior to January 1, 1978, a jury determined a defendant's competency to stand trial. Iowa Code § 783.2 (1975); *see also State v. Drosos*, 253 Iowa 1152, 1156, 114 N.W.2d 526, 528 (1962) (recognizing it is well settled law in Iowa that a jury determines the mental competency of a defendant to stand trial). Because a jury made the determination of a defendant's competency, we reviewed the jury's finding for substantial evidence and did not conduct a de novo review. *Id.*

Effective January 1, 1978, the legislature repealed section 783.2. 1976 Iowa Acts ch. 1245, ch. 4, §§ 526, 529. In its place, the legislature enacted section 812.4. 1976 Iowa Acts ch. 1245, ch. 2, § 1204. Section 812.4 required the court to make the determination of a defendant's competency to stand trial. Iowa Code § 812.4 (Supp. 1977). Although the legislature has amended chapter 812 numerous times since 1978, the determination of a defendant's competency to stand trial has remained with the court. *See* Iowa Code § 812.5 (stating the court shall receive all relevant evidence and make the determination of a defendant's competency to stand trial).

Since 1978, we have been somewhat inconsistent as to the standard of review we use to determine if a defendant is competent to stand trial. In *State v. Lyon*, 293 N.W.2d 8, 10 (Iowa 1980), the defendant's competency to stand trial became an issue during the trial. At that point, the court recessed the trial, personally questioned the defendant, and heard testimony from various experts regarding the defendant's competency. *Lyon*, 293 N.W.2d at 12. Based on this testimony, the trial court found the defendant competent to stand trial. *Id.* There, we conducted a de novo review, considered all the defendant's circumstances, and affirmed the trial court's finding of competency. *Id.* at 9, 12–13.

One year later, we were confronted with another case where a defendant's competency to stand trial was at issue. *State v. Jackson*, 305 N.W.2d 420, 422 (Iowa 1981). There, the trial court held a pretrial competency hearing. *Id.* In reviewing the competency ruling, we determined the standard of review was at law to determine whether substantial evidence supported the trial court's determination of competency. *Id.* at 425. In reaching this conclusion, we did not discuss

the constitutional implications of the competency issue, but instead relied on our pre-1978 decisions reviewing jury determinations of competency. *Id.*

In 1981, we were again confronted with a case involving a defendant's mental competency to stand trial. *State v. Pedersen*, 309 N.W.2d 490, 491 (Iowa 1981). In *Pedersen*, the trial court conducted a pretrial hearing to determine the defendant's competency. *Id.* at 492. After hearing testimony from conflicting experts, the trial court found the defendant competent to stand trial. *Id.* During the trial, the defendant began to display odd behavior. *Id.* at 492–95. The trial continued despite this behavior. *Id.* Noting that the trial of an incompetent defendant deprives that defendant of due process of law, we conducted a de novo review of the entire record including the pretrial hearing, the defendant's conduct during trial, and his conduct following trial. *Id.* at 495–501.

Two years later, we were again confronted with the issue of competency. *State v. Aswegan*, 331 N.W.2d 93, 95 (Iowa 1983). In *Aswegan*, two pretrial hearings were held to determine the defendant's competency to stand trial. *Id.* After the second hearing, the trial court found the defendant competent to stand trial. *Id.* There, we held the defendant did not raise a due process challenge with respect to the pretrial competency hearing; therefore, our review was not de novo. *Id.* This holding is inconsistent with the Supreme Court's statement that, " '[c]ompetence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel . . . .' " *Cooper*, 517 U.S. at 354, 116 S. Ct. at 1376–77, 134 L. Ed. 2d at 506 (quoting *Riggins v. Nevada*, 504 U.S. 127, 139–40, 112 S. Ct. 1810, 1817, 118 L. Ed. 2d 479, 492

(1992) (Kennedy, J., concurring)). We cannot see how the issue of a defendant's competence to stand trial does not implicate a defendant's due process rights.

In 1985, we reviewed another case involving the competency issue. *State v. Emerson*, 375 N.W.2d 256, 260 (Iowa 1985), *abrogated on other grounds by Horton v. California*, 496 U.S. 128, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990). In *Emerson*, the trial court held a pretrial hearing and determined the defendant was competent to stand trial. *Id.* On appeal, we held the standard of review was de novo because constitutional safeguards were implicated. *Id.* at 261.

In 1993, we decided *State v. Edwards*, 507 N.W.2d 393 (Iowa 1993). There, the defendant's competency became an issue during trial due to his obstreperous behavior. *Edwards*, 507 N.W.2d at 394. We reviewed the defendant's trial conduct de novo to determine if he was competent to stand trial because the issue of his incompetence raised a constitutional issue. *Id.* at 395.

Finally, in 1996, we decided *State v. Rieflin*, 558 N.W.2d 149 (Iowa 1996). There, after a pretrial hearing, the trial court found the defendant competent to stand trial. *Rieflin*, 558 N.W.2d at 151. On our discretionary review, we relied on *Jackson* and *Aswegan* in holding the scope of review was at law for substantial evidence because the court had held a pretrial competency hearing. *Id.* at 151–52. We did note, however, if competency became an issue during trial, our review was de novo. *Id.* The *Rieflin* court did not distinguish *Emerson* or discuss the constitutional implications of a competency-to-stand-trial challenge.

We believe *Jackson*, *Aswegan*, and *Rieflin* were wrongly decided as to the standard of review required when this court reviews a defendant's pretrial hearing to determine his or her competence to stand trial.

*Jackson* relied on our old cases, decided under a statute that allowed a jury to determine the defendant's competence to stand trial. *Jackson*, 305 N.W.2d at 425. *Aswegan* and *Rieflin* failed to consider that a defendant's competency to stand trial implicates a constitutional right. *Rieflin*, 558 N.W.2d at 151–52; *Aswegan*, 331 N.W.2d at 95. In Iowa, when an appeal involves a defendant's constitutional rights, we review the appeal de novo. *See, e.g., State v. Bruegger*, 773 N.W.2d 862, 869 (Iowa 2009) (reviewing sentence under the Cruel and Unusual Punishment Clause); *Formaro v. Polk County*, 773 N.W.2d 834, 838 (Iowa 2009) (reviewing claim that a statute violated the Ex Post Facto Clause); *State v. Harper*, 770 N.W.2d 316, 319 (Iowa 2009) (reviewing claim involving the Confrontation Clause); *State v. Cromer*, 765 N.W.2d 1, 6 (Iowa 2009) (reviewing ineffective-assistance-of-counsel claim under the Sixth Amendment); *State v. Kramer*, 760 N.W.2d 190, 193–94 (Iowa 2009) (reviewing application of the Double Jeopardy Clause under the Fifth Amendment); *State v. Mitchell*, 757 N.W.2d 431, 434 (Iowa 2008) (reviewing constitutionality of a statute under the Equal Protection Clause); *State v. Willard*, 756 N.W.2d 207, 211–12 (Iowa 2008) (reviewing prohibition against bills of attainder under the Federal and Iowa Constitutions); *State v. Fremont*, 749 N.W.2d 234, 236 (Iowa 2008) (reviewing validity of a search warrant under the Fourth Amendment); *State v. Harris*, 741 N.W.2d 1, 5 (Iowa 2007) (reviewing right against self-incrimination under the Fifth Amendment); *State v. Wells*, 738 N.W.2d 214, 218–19 (Iowa 2007) (reviewing breakdown of the attorney-client relationship under the Sixth Amendment); *State v. Smitherman*, 733 N.W.2d 341, 345 (Iowa 2007) (reviewing conflict of interest implicating the right to counsel under the Sixth Amendment).

We review de novo a district court decision implicating a defendant's constitutional rights, even if the district court held a full hearing on the matter below. *Formaro*, 773 N.W.2d at 838; *Harper*, 770 N.W.2d at 319; *Willard*, 756 N.W.2d at 211; *Fremont*, 749 N.W.2d at 236; *Harris*, 741 N.W.2d at 4–5; *Smitherman*, 733 N.W.2d at 344–45. The distinction made in *Rieflin*, that our review is de novo if the district court did not conduct a competency hearing, but for substantial evidence if the district court held a competency hearing, is inconsistent with our jurisprudence regarding the standard of review when constitutional issues are implicated. We see no reason to treat a defendant's due process rights, implicated by a claim of competency to stand trial, any differently from our review of other constitutional issues. Accordingly, we review a trial court's decision as to a defendant's competency to stand trial de novo and overrule any of our prior cases holding otherwise.

**B. Legal Framework.** At common law, the State could not try a criminal defendant if that person's mental condition was such that he or she lacked the capacity to understand the nature and object of the proceedings, to consult with counsel, and to assist in preparing a defense. *Drope v. Missouri*, 420 U.S. 162, 171, 95 S. Ct. 896, 903, 43 L. Ed. 2d 103, 112–13 (1975). The Supreme Court has stated the test to determine if a criminal defendant is competent to stand trial is whether the person " 'has sufficient present ability to consult with [counsel] with a reasonable degree of rational understanding—and whether [the person] has a rational as well as factual understanding of the proceedings.' " *Dusky v. United States*, 362 U.S. 402, 402, 80 S. Ct. 788, 789, 4 L. Ed. 2d 824, 825 (1960) (per curiam). In Iowa, we define the test as whether "the defendant is suffering from a mental disorder which prevents the defendant from appreciating the charge, understanding the

proceedings, or assisting effectively in the defense." Iowa Code § 812.3(1); *accord Rieflin*, 558 N.W.2d at 152; *Edwards*, 507 N.W.2d at 395; *Lyon*, 293 N.W.2d at 9. The common thread running through these tests is that a criminal defendant must be able to effectively assist counsel in his or her defense.

We presume a defendant is competent to stand trial. *Pedersen*, 309 N.W.2d at 496. The defendant has the burden of proving his or her incompetency to stand trial by a preponderance of the evidence. *Id.* If the evidence is in equipoise, the presumption of competency prevails. *Id.* Moreover, once a court finds a defendant competent to stand trial, the presumption of competency continues unless and until the defendant produces new evidence to the contrary. *Jackson*, 305 N.W.2d at 425–26.

In this appeal, June argues she suffers from amnesia concerning the facts and events surrounding the shooting; therefore, she asserts she was incompetent to stand trial because she was unable to effectively assist in her own defense. Particularly, she claims she was unable to assist her counsel in determining whether the defense of self-defense would be available to her.

Amnesia on its own will not render a criminal defendant incompetent to stand trial. *Emerson*, 375 N.W.2d at 261. Rather, a court must determine whether an amnesic defendant is competent to stand trial by the circumstances of each individual case. *United States v. Swanson*, 572 F.2d 523, 526 (5th Cir. 1978). A subjective circumstance to consider is the defendant's present ability to assist counsel in his or her defense. *Id.* Under a subjective circumstance analysis, the court should consider the defendant's particular situation including: (1) whether the defendant has the present ability to take the stand on matters other than the amnesic event, (2) whether the defendant suffers

from other pathological or psychological conditions that hinder the defendant's present ability to assist in his or her defense, and (3) whether a continuance would remediate the situation. *Id.* at 526–27.

An objective circumstance to consider is whether the defendant can receive a fair trial despite his or her amnesia. *Id.* at 527. To analyze this factor, a court should consider: (1) whether the crime and the defendant's whereabouts could be reconstructed without the defendant's testimony, (2) whether access to the information contained in the State's files would help fill in the gaps of the defendant's memory, and (3) how the defendant's testimony would affect the strength of the State's case. *Id.*

**C. Analysis.** The experts testifying regarding June's competency to stand trial offered differing opinions as to the extent and permanency of June's amnesia. On our de novo review, we find her amnesia is probably due to patchy memory retrieval, rather than memory formation. We reach this conclusion because she is able to remember some of the events, but not all of them. Although we cannot say whether June's amnesia is permanent or transient, we do believe it will probably last indefinitely into the future. From a subjective standpoint, we are left with an individual who has a memory of the events, but for some reason cannot relate her entire memory of the events to her attorneys at this time. We do not believe a continuance will help her patchy memory retrieval.

June's situation is not unlike many persons who are involved in similar incidents. No person's memory is complete; even under the best conditions everyone is amnesic to some degree due to the natural loss of memory or the failure to observe. *State v. Martens*, 521 N.W.2d 768, 771 (Iowa Ct. App. 1994); *see also United States v. Stevens*, 461 F.2d 317,

320 (7th Cir. 1972); *State v. McClendon*, 437 P.2d 421, 423, 425 (Ariz. 1968) (finding that "a defendant is entitled to a fair trial, but not necessarily to a perfect trial"). As the Seventh Circuit Court of Appeals noted about the plight of an amnesiac:

> "In his plight the amnesiac differs very little from an accused who was home alone, asleep in bed, at the time of the crime or from a defendant whose only witnesses die or disappear before trial. Furthermore, courts, of necessity, must decide guilt or innocence on the basis of available facts even where those facts are known to be incomplete, and the amnesiac's loss of memory differs only in degree from that experienced by every defendant, witness, attorney, judge, and venireman. How much worse off is a generally amnesic defendant on trial for murder, for example, than one who remembers all but the dispositive fact: who struck the first blow?

> . . . .

> If a defendant is permanently amnesic, furthermore, there will be no time in the future when the court can secure the benefit of his version of the facts. The choice facing the court would therefore be that of proceeding to adjudicate the defendant's guilt or innocence on the basis of incomplete data or abandoning the adjudicatory process altogether."

*Stevens*, 461 F.2d at 320 (quoting Note, *Amnesia: A Case Study in the Limits of Particular Justice*, 71 Yale L.J. 109, 128–29 (1961)).

In spite of June's memory problems, we believe June can receive a fair trial. The State's files and physical evidence make it relatively simple for the defense to reconstruct the facts surrounding the shooting. June was the only other individual at the house at the time of the shooting. The crime scene did not indicate a struggle took place prior to the shooting. June had no visible injuries indicating that Leo attacked her prior to the shooting. After the shooting, June made numerous calls to her family. There was no indication from the manner in which she spoke, or in the words she used to describe the incident, that signaled

she was in imminent danger of death or injury at the time of the shooting.

In none of the statements she made after the shooting, either at the scene, while being transported to the law enforcement center, or at the center, did she ever indicate that she shot Leo in self-defense. In fact, in two of her statements she said, "[w]ell, it's not self-defense actually," and "I wasn't threatened, but I had a reasonable reason." From the statements made by June, the physical evidence gathered, and the information contained in the State's file, we conclude June's amnesia did not prevent her from receiving a fair trial and agree with the district court that she was competent to stand trial.

### IV. Jury Instruction Regarding Second-Degree Murder.

**A. Standard of Review.** June claims the district court erred by failing to give a specific intent instruction in connection with its instruction regarding second-degree murder. Although we review a claim that the court gave an improper jury instruction for correction of errors at law, we review the related claim that the trial court should have given a defendant's requested instruction for abuse of discretion. *Summy v. City of Des Moines*, 708 N.W.2d 333, 340 (Iowa 2006). "Under Iowa law, a court is required to give a requested instruction when it states *a correct rule of law having application to the facts of the case* and when the concept is not otherwise embodied in other instructions." *Herbst v. State*, 616 N.W.2d 582, 585 (Iowa 2000) (emphasis added).

**B. Analysis.** The court instructed the jury that before it could find June committed the crime of second-degree murder, the State had to prove the following elements:

> 1. On or about the 15th day of May 2006, the defendant shot Leo Lyman.

    2. Leo Lyman died as a result of being shot.

    3. The defendant acted with malice aforethought.

June requested a specific intent instruction arguing that the act of shooting someone, as instructed in element number one, is an assault and to commit an assault, a person must necessarily have acted with specific intent. The district court rejected this argument and so do we.

In Iowa, all crimes are statutory. Iowa Code § 701.2 (stating, "[a] public offense is that which is prohibited by statute and is punishable by fine or imprisonment"). Iowa Code section 707.1 provides that a person commits murder when that person "kills another person with malice aforethought either express or implied." *Id.* § 707.1. Murder in the first degree occurs when a person commits murder under any of the following circumstances:

> 1. The person willfully, deliberately, and with premeditation kills another person.

> 2. The person kills another person while participating in a forcible felony.

> 3. The person kills another person while escaping or attempting to escape from lawful custody.

> 4. The person intentionally kills a peace officer, correctional officer, public employee, or hostage while the person is imprisoned in a correctional institution under the jurisdiction of the Iowa department of corrections, or in a city or county jail.

> 5. The person kills a child while committing child endangerment under section 726.6, subsection 1, paragraph "*b*", or while committing assault under section 708.1 upon the child, and the death occurs under circumstances manifesting an extreme indifference to human life.

> 6. The person kills another person while participating in an act of terrorism as defined in section 708A.1.

*Id.* § 707.2. Murder in the second degree occurs when "[a] person . . . commits murder which is not murder in the first degree." *Id.* § 707.3. Thus, murder in the second degree has only two elements—a person kills another person and does so with malice aforethought.

The first element required for a person to commit second-degree murder is the killing of a person. The killing can occur by an affirmative act, such as when a person shoots another person, or by an omission to act when there is a duty to do so, such as when a parent fails to provide medical care for a child who dies from a lack of care. 1 Wayne R. LaFave, *Substantive Criminal Law* §§ 6.1, .2, at 422–23, 435–36 (2d ed. 2003).

The second element required for a person to commit second-degree murder is that the act of killing another person is done with malice aforethought. Malice aforethought requires the actor to have "a fixed purpose or design to do physical harm to another that exists before the act is committed." *State v. Myers*, 653 N.W.2d 574, 579 (Iowa 2002). "'It does not mean mere spite, hatred, or ill will, but does signify that state of disposition which shows a heart regardless of human life.'" *State v. Leedom*, 247 Iowa 911, 917, 76 N.W.2d 773, 777 (1956) (quoting *State v. Burris*, 198 Iowa 1156, 1158, 198 N.W. 82, 84 (1924), *overruled on other grounds by State v. Kernes*, 262 N.W.2d 602, 604 (Iowa 1978)). It is well-settled law that murder in the second degree is a general intent crime only requiring proof of malice aforethought. *State v. Kraus*, 397 N.W.2d 671, 672–73 (Iowa 1986).

June argues when the court instructs the jury that the State must prove June shot Leo, the court must also give the jury a specific intent instruction because a shooting is an assault, and an assault can only be committed with specific intent. We disagree.

The first element the State must prove to convict June of second-degree murder is that June killed another person, namely Leo. It does not matter how she accomplished the act of killing. She could have shot Leo as alleged or withheld medical care if the State proved she had a duty to provide such care. The *manner* of killing another is not an element of the crime; the only element required by the Code is that she did an act that killed another person. Thus, if the State proves June did an act to kill Leo with malice aforethought, she is guilty of murder in the second degree. Neither the killing of another person nor malice aforethought requires specific intent under section 707.3. Consequently, the district court was correct in refusing to give a specific intent instruction for second-degree murder.

### V. Ineffective Assistance of Counsel.

**A. Standard of Review.** Claims involving ineffective assistance of counsel have their basis in the Sixth Amendment to the United States Constitution and we review these claims de novo. *State v. Allen*, 708 N.W.2d 361, 365 (Iowa 2006).

**B. Analysis.** " 'In order for a defendant to succeed on a claim of ineffective assistance of counsel, the defendant must prove: (1) counsel failed to perform an essential duty and (2) prejudice resulted.' " *Id.* (quoting *State v. Wills*, 696 N.W.2d 20, 22 (Iowa 2005)); *see also Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674, 693 (1984). To prove counsel failed to perform an "essential duty," a defendant must prove counsel's performance was deficient, meaning trial counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064, 80 L. Ed. 2d at 693. Trial counsel's performance is measured objectively by

determining whether counsel's assistance was reasonable, under prevailing professional norms, considering all the circumstances. *Id.* at 688, 104 S. Ct. at 2065, 80 L. Ed. 2d at 694; *State v. Maxwell*, 743 N.W.2d 185, 195 (Iowa 2008). Establishing this first prong is not easy because " 'there is a strong presumption trial counsel's conduct fell within the wide range of reasonable professional assistance.' " *State v. Graves*, 668 N.W.2d 860, 881 (Iowa 2003) (quoting *DeVoss v. State*, 648 N.W.2d 56, 64 (Iowa 2002)).

To establish prejudice, a defendant must prove "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068, 80 L. Ed. 2d at 698. To establish a reasonable probability that the result would have been different, we have stated that a defendant "need only show that the probability of a different result is 'sufficient to undermine confidence in the outcome.' " *Graves*, 668 N.W.2d at 882 (quoting *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068, 80 L. Ed. 2d at 698).

June claims her trial counsel was ineffective for failing to redact and/or object to the introduction of video evidence depicting June's repeated invocations of her right to remain silent by requesting an attorney, as well as for failing to object to several prosecution references to these statements made during the prosecutor's closing argument. It is impermissible to use an individual's exercise of his or her constitutional rights against them after the State implicitly assured the individual, through the *Miranda* warning, that his or her invocation of those rights would not be penalized. *Wainwright v. Greenfield*, 474 U.S. 284, 292, 106 S. Ct. 634, 639, 88 L. Ed. 2d 623, 631 (1986). Any breach of this implied assurance is a breach of fundamental fairness required by the

due process clauses of the Federal and Iowa Constitutions. *Id.* at 291, 106 S. Ct. at 638–39, 88 L. Ed. 2d at 630; *State v. Decker*, 744 N.W.2d 346, 353–54 (Iowa 2008). Additionally, the Supreme Court has held that prosecutorial comments concerning a defendant's silence are constitutionally banned. *Griffin v. California*, 380 U.S. 609, 615, 85 S. Ct. 1229, 1233, 14 L. Ed. 2d 106, 110 (1965). Under this record, however, we cannot reach June's claim of ineffective assistance of counsel.

The State charged June with first-degree murder. First-degree murder is a specific intent crime. *State v. Jespersen*, 360 N.W.2d 804, 807 (Iowa 1985). As a defense to this charge, June raised the defense of diminished responsibility. The court instructed the jury that " 'diminished responsibility' means a mental condition which does not allow the person to form a premeditated, deliberate, specific intent to kill." The jury did not return a verdict for first-degree murder under these instructions. The state of the record does not allow us to decide if June's trial counsel purposely decided not to object to this evidence or prosecutorial comments to show June's mental state at the time of the shooting, in order to bolster her diminished responsibility defense. Trial tactics may require counsel to forego certain defenses or objections in pursuit of the best interests of the accused. *State v. Rand*, 268 N.W.2d 642, 649 (Iowa 1978). Accordingly, we will not address June's ineffective-assistance-of-counsel claim on direct appeal.

## VI. Disposition.

We affirm June's conviction for second-degree murder because the district court was correct when it found June competent to stand trial and when it refused to give a specific intent instruction for second-degree

murder.  However, we do not reach June's claim of ineffective assistance of counsel on direct appeal.

**AFFIRMED.**