# IN THE COURT OF APPEALS OF IOWA

No. 19-1229
Filed November 3, 2021

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**JAMES DEYO ROBINSON, JR.,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Polk County, Jeffrey D. Farrell, Judge.

The defendant appeals his convictions of burglary in the first degree, willful injury causing serious injury, first-degree harassment, and false imprisonment. **AFFIRMED.**

Mary Lynn Wolfe of Wolfe Law Office, Clinton, for appellant.

Thomas J. Miller, Attorney General, and Genevieve Reinkoester, Assistant Attorney General, for appellee.

Considered by Tabor, P.J., and Greer and Badding, JJ.

**GREER, Judge.**

A jury convicted James Robinson Jr. of burglary in the first degree, willful injury causing serious injury, first-degree harassment, and false imprisonment. Robinson, who represented himself at trial, appeals. He (1) raises a fair cross-section challenge to his jury pool; (2) argues he was neither competent to stand trial nor waive his right to counsel and represent himself; (3) maintains the district court abused its discretion in denying his motion to strike a potential juror for cause; and (4) contends a jury instruction contained a prejudicial error, which he asks us to review after adopting a plain error standard for self-represented defendants.

**I. Background Facts and Proceedings.**

In April 2017, Robinson was charged by trial information with burglary in the first degree, willful injury causing serious injury, harassment in the first degree, and false imprisonment. The charges stemmed from actions Robinson allegedly took the month before and involved his girlfriend, C.G., as the complaining witness.

In October, Robinson's attorney,[1] Gerald Feuerhelm, asked the court to allow him to withdraw from his representation of Robinson. In his written motion, Feuerhelm asserted that during his third meeting with Robinson, Robinson conveyed he no longer wanted to pursue a plea agreement and instead wanted to focus on a defense of diminished responsibility. When counsel met with Robinson ten days later, Robinson was irritated counsel had yet to assert his diminished responsibility defense. Counsel told him it would take some time to develop, and Robinson "referred to [counsel] as a liar, pointed his finger at [him] and acted in a

---

[1] This attorney was appointed on September 18, 2017, after Robinson's first attorney was allowed to withdraw.

very aggressive manner." The attorney left the room, and Robinson followed him until a guard stepped in. Then Robinson yelled "You are fired" as Feuerhelm walked away. The attorney claimed the attorney-client relationship had irreparably broken down, which prevented him from continuing to represent Robinson. Following a hearing, the attorney was allowed to withdraw, and Robinson was appointed new counsel, Jesse Macro Jr.

On February 26, 2018, Macro moved to withdraw, stating that when he met with Robinson that day, Robinson "was hostile and paranoid and accused [him] of being in a conspiracy with his previous attorneys." The same day, Robinson filed a pro se request for new attorney, alleging Macro "has not returned crucial eviden[ce] that helps my case" and stating, "I must assume that he is against me as well." Following a hearing on the motions, the court denied them both.

In April, Macro applied for a mental competency hearing to determine if Robinson was competent to stand trial. In support of his application, Robinson's attorney asserted Robinson "is paranoid and contends the undersigned as well as all previous attorneys are participating in a conspiracy against him for a number of reasons." Counsel claimed Robinson could not effectively assist in his defense as a result of the paranoia. Counsel also moved to withdraw. The court held a hearing on both motions. It denied counsel's motion to withdraw but granted the motion to have Robinson's competency to stand trial evaluated.

Licensed psychologist Dr. Michael Huston evaluated Robinson on April 11. In his report, filed April 16, Dr. Huston noted Robinson reported he had been "involved in outpatient mental health treatment for depression, anxiety, and neurological issues in 2000, after [Robinson] suffered a brain injury while

undergoing surgery on his shoulder." Dr. Huston observed, "[Robinson] denied hallucinations and did not display signs of psychosis. He was fully oriented. He displayed awareness and insight regarding his situation and mental health issues. His basic cognitive abilities appeared intact." He concluded Robinson "appear[ed] to be depressed and to have anxiety related to his circumstances" but "demonstrated sufficient mental abilities to be considered competent to stand trial at this time."

The next day, April 17, Dr. Huston filed a letter with the court and changed his opinion "regarding Mr. Robinson's competency to stand trial" based on information he received from Robinson's attorney. According to Dr. Huston,

> [Macro] described a pattern of behavior and statements by Mr. Robinson during their interactions, and during interactions with previous attorneys, that suggests irrational, delusional thinking of a persecutory nature. His description is consistent with an uncommon psychiatric condition called Delusional Disorder, which causes specific, false beliefs to be held with unusual persistence, and any effort by others to contradict these beliefs causes strong negative, defensive reactions. Mr. Robinson has persistently voiced beliefs about a conspiracy against him by attorneys and made other false claims, and has reacted quite defensively when this view was questioned, according to [Macro]. Mr. Robinson voiced his mistrust of attorneys in general during my evaluation of him, although these statements did not appear delusional. Had I questioned him further on this topic I may have uncovered the delusional nature of this mistrust. Mr. Robinson also expressed unusually strong beliefs about how a brain injury he suffered in 2000 has affected his life. This type of belief is also consistent with Delusional Disorder.
>
> Another aspect of Delusional Disorder is the ability of individuals with this condition to function and behave normally, think rationally and otherwise show no symptoms of mental illness when their delusional beliefs are not being invoked or challenged.
>
> In my opinion, the nature of Mr. Robinson's condition does prevent him from assisting effectively in his defense and therefore he can be considered not competent to stand trial at this time. Psychiatric treatment is recommended to restore his competency. I recommend transfer to the Mental Health Institute in Cherokee for psychiatric treatment.

Following the April 18 hearing, the court found Robinson was "suffering from a mental disorder which prevent[ed] him from appreciating the charges, understanding the proceedings, or assisting effectively in his own defense" and that he posed a danger to the public peace and safety. Proceedings in the case were suspended, and Robinson was sent to the Iowa Medical and Classification Center "to restore [Robinson] to competency."

Based on an interview with Robinson on June 5, Dr. Arnold Andersen opined Robinson was competent to stand trial. In his report, filed June 18, Dr. Andersen concluded:

> To a reasonable degree of medical certainty, Mr. Robinson is competent to stand trial. He appreciates the charges he faces and gives a reasonable estimate of the range of punishments. He understands a key principle of the American Justice System. He is able to assist counsel, should he choose to do so. His grievances against counsel appear to be part of a jaundiced view of counsel's activities and not due to any major mental illness. He has a rational and factual understanding of the key personnel in court. I believe he can follow the events of a trial without any significant intrusion from any mental health symptoms.

On June 28, the court held a hearing to address whether Robinson's competency was restored and a renewed motion by Robinson's counsel to withdraw. Based on Dr. Andersen's report, the court found Robinson was competent to stand trial. It then concluded "the communications" between counsel and Robinson "ha[d] broken down to the point where" counsel could no longer represent Robinson and granted Macro's motion to withdraw.

On July 2, Robinson was appointed his fourth attorney, Gary Dickey.

On September 27, Robinson filed notice of the defense of diminished capacity. The next day, his attorney filed a motion asking that Robinson again be

evaluated to determine if he was competent to stand trial. Dickey's motion referenced a status conference that took place the day before, during which Robinson accused him of being in a conspiracy with the prosecution. Following an unreported hearing, the court found probable cause Robinson was suffering from a mental disorder that prevented him from standing trial.

Dr. Huston evaluated Robinson on October 10 and, in the report filed October 16, found him competent to stand trial. Dr. Huston observed:

> Mr. Robinson had no difficulty with comprehension or communication in general or regarding his legal situation. He expressed strongly held beliefs about certain aspects of his legal case and the defense he would like [to] make, and voiced frustration about disagreements he has had with his attorney on the matter. An extended discussion about his viewpoint did not reveal delusional thinking or other thought disorder that prevents Mr. Robinson from making rational decisions. He displayed the capacity to recognize and weigh essential information regarding his legal situation in a rational manner. He expressed uncertainty about whether his attorney is willing to try to prove him innocent of his charges, but he said he is "working with him the best I can." He recognized that his attorney does not necessarily have the same viewpoint he has about his legal situation.

At a hearing on October 18, Robinson's attorney stated the court "would be well within its authority to find Mr. Robinson competent and then reset the deadlines in this case." Robinson orally requested a new attorney. Ruling from the bench, the court found Robinson competent to stand trial and granted his request for a new attorney—Robinson's fifth. Christine Branstad was appointed later the same day.

On January 25, 2019, at a hearing scheduled for Robinson to enter a plea, Robinson indicated to the court that he no longer wanted to plead guilty and now wanted to represent himself. The court granted Robinson's motion to remove Branstad as counsel, finding there had been a complete breakdown in

communication between the two. After engaging in a colloquy with Robinson, the court also granted Robinson's motion to represent himself and appointed standby counsel to assist him at trial.

A multiple-day jury trial took place from April 15 to April 19. As previously decided, Robinson represented himself with the assistance of standby counsel. Robinson testified in his own defense. During his testimony, he admitted striking, stabbing, choking, and stomping on C.G. on March 9 and 10, 2017. He relied on a defense of diminished capacity and focused on a claimed brain injury in 1996[2] and the mental-health issues he experienced afterward. Other than his testimony, Robinson offered into evidence some reports from his therapist following sessions he attended between June 16, 2016 and March 9, 2017. The therapist's reports suggest Robinson may have diagnoses of generalized anxiety disorder and post-traumatic stress disorder. Robinson did not offer any documentation to support his claimed brain injury or any adverse effects from such an injury.[3]

---

[2] According to Robinson, he "had a surgery in 1996 that caused [him] to die for six-and-a-half minutes." In other words, he maintained that because of a complication with the 1996 surgery, his brain was without oxygen for an extended period, which caused a brain injury. He claimed he improved until 2016, when he underwent surgery to repair his meniscus. According to Robinson, he was given the same anesthesia during the 2016 procedure, which caused further issues. Yet in Robinson's evidence that he offered at trial—the report from his therapist following his June 16, 2016 appointment—Robinson reported his 2016 surgery "had a problem which he explains was at the end in taking out the tube and his throat shut and led to panic, fear and complications." At trial, during cross-examination, Robinson agreed that the 2016 surgery "[went] to [his] anxiety" and was "not a brain injury."

[3] We recognize Robinson made comments to his therapist about the surgeries and claimed brain injury, which were in the therapist's reports, but we distinguish reports based on his claims with other, more objective reports.

The jury convicted Robinson as charged. He was sentenced to a total indeterminate sentence not to exceed thirty-five years. He appeals.

## II. Discussion.

### A. Fair Cross Section.

"The Sixth Amendment to the United States Constitution provides that '[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed.'" *State v. Plain*, 898 N.W.2d 801, 821 (Iowa 2017) (quoting U.S. Const. amend. VI) (alteration in original). "The right to an impartial jury entitles the criminally accused to a jury drawn from a fair cross-section of the community." *Id.* (citing *Taylor v. Louisiana*, 419 U.S. 522, 530 (1975)). Here, Robinson argues his right was violated because African Americans were underrepresented in the makeup of the jury pool when compared to the population in Polk County—where Robinson's trial took place.

But, as the State argues, Robinson waived his fair cross-section claim. During voir dire, Robinson initially objected, raising "the issue of the lack of African American people on the jury" and specifying he was relying on *Plain* for his objection. The court considered Robinson's objection and then decided to take a break in the proceedings to get information from the jury clerk about the makeup of the entire jury pool.[4] After a recess, the court stated on the record that it learned

---

[4] A jury pool is "the sum total of prospective jurors reporting for service." Iowa Code § 607A.3(6) (2019). Whereas a jury panel "means those jurors drawn or assigned for service to a courtroom, judge, or trial." *Id.* § 607A.3(10). While Robinson's objection seemed to stem from the lack of African Americans on his jury panel, the trial court correctly recognized a fair cross-section involves claims of systemic exclusion of a distinctive group from a *jury pool*. *See State v. Williams*,

there were "256 jurors who were called down to Polk County today" and thirteen of those 256 identified as African American. The court opined the pool was "legally sufficient" and offered to "add some people from another panel that aren't selected for that jury" to make Robinson's panel "at least somewhat inclusive of African Americans." Robinson agreed, and the court took another recess to wait for jury selection to be completed in another courtroom. Eventually, thirteen other potential jurors were added to Robinson's jury panel. The court then asked Robinson, "Does that resolve your concerns or do you have any requests that you would like to make?" Robinson responded, "Not at this time, Your Honor," and voir dire continued without further objection.

Here, Robinson raised a fair cross-section challenge to the court, and the court provided him with a remedy. Afterward, Robinson was given another chance to weigh in and he acquiesced. In doing so, he waived his right to assert a fair cross-section challenge on appeal. *See State v. Spiker*, 2021 WL 377120, at *5 (Iowa Ct. App. Feb. 3, 2021) ("After a party objects, a 'subsequent affirmative act amounting to an express or implied assent . . . ' waives that objection." (quoting *State v. Schmidt*, 312 N.W.2d 517, 518 (Iowa 1981)); *State v. Escobedo*, 573 N.W.2d 271, 277 (Iowa Ct. App. 1997) ("Nearly all error, including jury irregularities, may be waived."); *see also State v. Sage*, 162 N.W.2d 502, 504 (Iowa 1968) ("A party to a criminal proceeding cannot assume inconsistent

929 N.W.2d 621, 630 (Iowa 2019) ("For Sixth Amendment purposes, the defendant must . . . show that the percentage of the group in the jury pool is less than [the] expected percentage by at least two standard deviations. Pools may be aggregated, so long as pools closer in time to the trial date are not omitted when earlier pools are included." (citations omitted)).

positions in the trial and appellate courts and, as a general rule, will not be permitted to allege an error in which he himself acquiesced, or which was committed or invited by him." (citation omitted)). We do not consider this further.

**B. Competency.**

Next, Robinson claims he was not competent to stand trial or execute the waiver of his right to counsel. He maintains his counsel breached essential duties when they failed to object to the court's determinations he was competent to stand trial (in June and October 2018) and the court's acceptance of his waiver of counsel (in January 2019).[5]

We review claims of ineffective assistance de novo. *State v. Tate*, 710 N.W.2d 237, 239 (Iowa 2006). To succeed on his claim, Robinson has the burden to prove by a preponderance of the evidence both that (1) his counsel failed to perform an essential duty, and (2) prejudice resulted. *See id.* at 240. Counsel is required "to exercise reasonable diligence in deciding whether an issue is 'worth raising.'" *State v. Westeen*, 591 N.W.2d 203, 210 (Iowa 1999) (citation omitted). "In accord with these principles, we have held that counsel has no duty to raise an issue that has no merit." *State v. Dudley*, 766 N.W.2d 606, 620 (Iowa 2009). "We can reach an ineffective-assistance-of-counsel claim on a direct appeal if the record is sufficient to reach it."[6] *State v. Harris*, 919 N.W.2d 753, 754 (Iowa 2018).

---

[5] While Robinson was not required to raise these issues under a claim of ineffective assistance, *see State v. Lucas*, 323 N.W.2d 228, 232 (Iowa 1982), he chose to bring them that way, and our review is informed by the claims he actually raised on appeal.

[6] Disposition was entered against Robinson in June 2019, before Iowa Code section 814.7 (Supp. 2019) took effect. *See State v. Damme*, 944 N.W.2d 98, 104 n.1 (Iowa 2020) (reiterating the "date of the *judgment* being appealed controls the applicability" of the amended legislation).

But "[o]nly in rare cases will the trial record alone be sufficient to resolve the claim on direct appeal." *Tate*, 710 N.W.2d at 240. "If the record is insufficient to allow for a review on direct appeal, we do not reach the issue on direct appeal and allow the defendant to raise the claim in a separate postconviction-relief action." *Harris*, 919 N.W.2d at 754.

### 1. Competency to Stand Trial.

"The trial of an incompetent defendant in a criminal matter violates the defendant's due process rights as guaranteed by the Fourteenth Amendment to the United States Constitution." *State v. Lyman*, 776 N.W.2d 865, 871 (Iowa 2010), *overruled on other grounds by Alcala v. Marriott, Int'l, Inc.*, 880 N.W.2d 699, 708 (Iowa 2016). "[T]he test for competence to stand trial is whether the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . and . . . a rational as well as factual understanding of the proceedings against him.'" *State v. Einfeldt*, 914 N.W.2d 773, 778–79 (Iowa 2018) (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960)).

"There is a presumption that a defendant is competent to stand trial." *State v. Reiflin*, 558 N.W.2d 149, 152 (Iowa 1996), *overruled on other grounds by Lyman*, 776 N.W.2d at 871. But when there is a question of the defendant's competency, there is a procedural mechanism to have the competency evaluated. *See Einfeldt*, 914 N.W.2d at 779; *see also* Iowa Code § 812.3(1). As here, when counsel raises the issue of the defendant's competency, "the court shall suspend further proceedings and determine if probable cause exists to sustain the allegations." Iowa Code § 812.3(1). Then,

> [u]pon a finding of probable cause sustaining the allegations, the court shall suspend further criminal proceedings and order the defendant to undergo psychiatric evaluation to determine whether the defendant is suffering from a mental disorder which prevents the defendant from appreciating the charge, understanding the proceedings, or assisting effectively in the defense.

*Id.* § 812.3(2). Afterward, at the competency hearing, the court "shall receive all relevant and material evidence offered at the hearing . . . includ[ing] the psychiatric evaluation." *Id.* § 812.5. "If the court finds the defendant is competent to stand trial, the court shall reinstate the criminal proceedings." *Id.* § 812.5(1).

This process twice happened in Robinson's underlying trial. Robinson's third attorney, Macro, and his fourth attorney, Dickey, asked the court to evaluate whether Robinson was competent to stand trial (in April and September 2018, respectively). At their requests, Robinson was evaluated by mental-health professionals. In the first instance, Dr. Huston found Robinson competent but then, after speaking further with Macro, changed his opinion and gave Robinson a provisional diagnosis of delusional disorder. Robinson then spent about six weeks at the Iowa Medical and Classification Center before Dr. Andersen opined, to a reasonable degree of medical certainty, that Robinson was competent to stand trial. Following this report, the court held a hearing on the issue and found that Robinson's competence had been restored. About three months later, Dickey asked the court to again evaluate Robinson's competence to stand trial. Robinson was evaluated again—this time by Dr. Huston, who opined Robinson was competent. Upon receiving this report and holding another hearing, the court concluded Robinson was competent to stand trial.

As we understand Robinson's claim of ineffective assistance, he asserts that Macro and Dickey breached essential duties when they failed to object to the court's conclusion that Robinson was competent to stand trial following competency evaluations by mental-health professionals who gave that opinion. Reciting conspiracy comments he made throughout the proceedings, Robinson argues the diagnosis of delusional disorder that once provided the basis for an incompetency finding existed during the entire pendency of the proceedings. Robinson insists his attorneys should have raised these concerns, but even more, investigated Robinson's theories related to his mental-health condition.

But counsel only has a duty to raise objections that have merit. While Robinson continued making claims his various counsel were against him and refused to pursue the defense he wanted to put forth, we know that at least some of these facts were known to Dr. Huston and Dr. Andersen, who both issued reports opining Robinson was competent. In June, Dr. Andersen noted Robinson's "grievances against counsel appear to be part of a jaundiced view of counsel's activities and not due to any major mental illness." And Dr. Huston's October report referenced that:

> [Robinson] expressed strongly held beliefs about certain aspects of his legal case and the defense he would like [to] make, and voiced frustration about disagreements he has had with his attorney on the matter. An extended discussion about his viewpoint did not reveal delusional thinking or other thought disorder that prevents Mr. Robinson from making rational decisions. He displayed the capacity to recognize and weigh essential information regarding his legal situation in a rational manner. He expressed uncertainty about whether his attorney is willing to try to prove him innocent of his charges, but he said he is "working with him the best I can." *He recognized that his attorney does not necessarily have the same viewpoint he has about his legal situation.*

(Emphasis added). Still, both professionals weighed this information with the other information they gleaned during their evaluations of Robinson and opined he was competent. The district court, who also interacted with Robinson, was clearly persuaded by the opinions of the mental-health professionals. "[O]nce a court finds a defendant is competent to stand trial the presumption of competency continues unless and until the defendant produces new evidence to the contrary." *Lyman*, 776 N.W.2d at 874, *overruled on the other grounds by Alcala*, 880 N.W.2d at 708. And we cannot find that, but for counsel's lack of objection, the court would have determined Robinson lacked competence to stand trial. In sum, because Robinson's demeanor and actions remained consistent throughout the proceedings—from the times he was found to be competent in June and October up through trial—we cannot say an objection by counsel to the court's finding of competence to stand trial would have been successful. So counsel did not breach a duty by not objecting.

**2. Waiver of Counsel.**

Likewise, Robinson points to the silence of his attorney, when his counsel failed to object to Robinson's waiver of counsel, as breach of an essential duty under the ineffective assistance framework. Robinson maintains he was not competent to execute the waiver of counsel so it was not knowing, intelligent, and voluntary. *See Hannan v. State*, 732 N.W.2d 45, 52 (Iowa 2007) ("A proper waiver must be voluntary, knowing, and intelligent.").

"A defendant's constitutional right to counsel is effective until waived." *Id.* "Because [Robinson's] stand-by counsel at trial is not equivalent to representation and does not cure an improper waiver, [Robinson's] right to counsel was violated

unless he properly waived it." *Id.* And "the Constitution *permits* States to insist upon representation by counsel for those competent enough to stand trial under *Dusky* but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." *Indiana v. Edwards*, 554 U.S. 164, 178 (2008) (emphasis added). But, since the United States Supreme Court took this new position, our supreme court has not enunciated a higher standard to represent oneself. *See Godinez v. Moran*, 509 U.S. 389, 398 (1993) ("[W]e reject the notion that competence to plead guilty or to waive the right to counsel must be measure by a standard that is higher than (or even different from) the *Dusky* standard."); *see also State v. Rater*, 586 N.W.2d 655, 660 (Iowa 1997) ("Competency to stand trial is judged by the same standard as competency to waive the right to counsel." (citing *Godinez*, 509 U.S. at 400).

Robinson asserts the waiver was not voluntary when he held the belief that he had to represent himself because all of his defense attorneys were dishonest, were working against him, and were conspiring with the prosecution and district court to protect one of his former attorneys, who now was a judge. Our record on this appeal shows that even after raising the paranoia expressed towards counsel in April 2018, Dr. Huston later confirmed Robinson's competence to stand trial in October. And, during the trial, Robinson showed himself to be articulate through his opening and closing, robustly cross-examined of witness, and exhibited he understood basic concepts of his defense during his testimony and throughout the process.

Although a finding of mental competence to stand trial does not always equate to mental competence to conduct a trial, here, we use the same record on

competency to address Robinson's competence to waive the right to counsel. Likewise, the court engaged in an extensive colloquy with Robinson about his choice to represent himself. "We will assume without deciding that the standard to establish competency to represent oneself differs from the standard to establish competency to stand trial, in that competency to self-represent also requires a showing of competency to present a defendant without the help of counsel." *State v. Campbell*, No. 16-0550, 2017 WL 2464070, at *6 (Iowa Ct. App. June 7, 2017) (holding the defendant's understanding of the process and the charges and his belief he was competent provided support for a waiver that was knowingly and intelligently made). Such was the case for Robinson. As we already said, "once a court finds a defendant is competent to stand trial the presumption of competency continues unless and until the defendant produces *new evidence* to the contrary." *Lyman*, 776 N.W.2d at 874, *overruled on the other grounds by Alcala*, 880 N.W.2d at 708 (emphasis added). And because Robinson does not point to any new evidence to support a finding of incompetence after the October 2018 determination and the point he waived his right to counsel in January 2019, we cannot say an objection by counsel to Robinson's waiver would have been successful.

Robinson's claims of ineffective assistance fail.

**C. For-Cause Strike.**

Robinson moved to strike prospective juror P.K. for cause, and the district court denied his motion. He appeals that ruling, arguing the district court abused

its discretion.[7]  *See State v. Jonas*, 904 N.W.2d 566, 571 (Iowa 2017) ("We review the district court's rulings on challenges to potential jurors for causes for abuse of discretion.").

Iowa Rule of Criminal Procedure 2.18(5)(k) allows the State or the defendant to challenge for cause if the potential juror has "formed or expressed such an opinion as to the guilt or innocence of the defendant as would prevent the juror from rendering a true verdict upon evidence submitted on the trial."  Here, P.K. revealed on his juror questionnaire that he had been a victim of a crime.  When asked about it, P.K. said he had been assaulted in a restaurant in 2002.  Away from the other prospective jurors, the following exchange took place:

> PROSECUTOR: And what I'm trying to find out is: Do you have any concerns about being a victim of an assault yourself?  Do you have any concerns about your ability to be fair and impartial in this case?
> P.K.: Absolutely.
> PROSECUTOR: You do have concerns about that?
> P.K.: Yeah.
> PROSECUTOR: So talk to me about that.
> P.K.: I mean, I guess my concern would be that I don't know that I can be, you know, impartial to having been a victim of a situation like that.
> PROSECUTOR: Okay.  Let me do it a little bit differently.  Obviously, there's no right or wrong answers.  We're trying to figure out how you feel about something.  Just be honest with us.  Okay?  As Mr. Robinson sits here right now, he is presumed innocent; right?
> P.K.: Sure.
> PROSECUTOR: Okay.  He's been alleged to have committed an assault-type crime.  Are you telling us that you don't believe that you'll be able to afford him that presumption of innocence because of the personal circumstances that you've gone through?
> P.K.: I mean, I guess I would have to hear the story and the facts; right?  So—

---

[7] In passing, Robinson also claims his right to due process and his right to have his guilt determined by an impartial jury were violated.  Robinson does not develop his constitutional claims, so we review his challenge on appeal only as it pertains to whether his for-cause challenge should have been granted under rule 2.18(5)(k).

PROSECUTOR: Would you be willing—well, do you believe that you could actually set aside what you went through as a victim and try to make a decision based solely on what you hear in the courtroom?

P.K.: Maybe.

PROSECUTOR: Okay. Your Honor, I have no additional questions for this juror.

THE COURT: Mr. Robinson, do you have any questions?

ROBINSON: Sure. Do you have any African-American friends?

P.K.: Do I?

ROBINSON: Uh-huh.

P.K.: Yes.

ROBINSON: How often do you spend time with them?

P.K.: Well, not very often because they live in other states, and I recently moved here so I haven't seen them in quite a while.

ROBINSON: Okay. You said that you feel like you can be objective in this situation?

P.K.: Maybe. I would have to hear the story to what happened. I mean, I—I don't know what the case is or what's going on, so—

ROBINSON: Okay. Can we have him struck for cause?

THE COURT: [Prosecutor]?

PROSECUTOR: Your Honor, I believe that the best argument the defendant would be making is under 2.18(5), specifically sub k, a juror forming or expressing such an opinion as to the guilt or innocence of the defendant. And I don't believe that's what this juror has done at this point. I think the juror has made it clear that he will make attempts, that his prior experience kind of forged who he is, and that he may have some concerns about it, but he understands the presumption of innocence and hasn't expressed an opinion.

THE COURT: Yeah. [P.K.] let me just follow up with you. What happened with you was a significant event in your life, it sounds like, is that fair to say?

P.K.: Yeah. And just to be, I guess, candid with why I have reservations about it, I guess is because in my case I don't feel like there was due diligence towards the other side. You know, there was the detective that was assigned to the case. He had murder cases and other things going on, so my case was pushed to the bottom, so it was never closed.

THE COURT: Okay. So you don't feel that you got the full attention of law enforcement?

P.K.: I absolutely did not. I absolutely didn't.

THE COURT: So when you talk about being concerned that you would be fair and impartial, would that—do you think it would favor the State or do you think it would favor the defendant, or do you—can you tell us?

P.K.: I don't know. It—I've just never been a part of a jury before, so I can't honestly say, you know, how it would go. I mean, I would like to think that I would be fair and reasonable, but I don't know.

THE COURT: You talked about needing to hear the story. That's what trials are all about, each party having the opportunity to tell you what they believe the facts regarding these allegations are. Do you think that you would be able to listen to those and reason through those and make a decision that was based upon the evidence in the case and then based upon the legal instructions that I ultimately would give to the jury?

P.K.: I mean, I believe I'm pretty reasonable.

THE COURT: All right. I'm going to deny the request to strike at this point in time. I think [P.K.] has given us enough information that he could be fair and impartial in this case. So I'm going to deny that request.

After the court denied Robinson's request to strike P.K. for cause, P.K. returned to the jury panel and ultimately sat on the jury—neither the State nor Robinson used a preemptive strike on P.K.

Even if we concluded on this record that the district court abused its discretion in failing to disqualify to P.K. from serving on the jury, the resolution of Robinson's claim on appeal hinges on the question of prejudice. *See Jonas*, 904 N.W.2d at 575–76. Robinson maintains we should presume prejudice. *See id.* at 576 ("For many years, our caselaw in Iowa provided that error in denying a challenge to a potential juror for cause was presumed to be prejudicial under state law."). But that is no longer the rule. Rather,

in order to show prejudice when the district court improperly refuses to disqualify a potential juror under Iowa Rule of Criminal Procedure 2.18(5)(k) and thereby causes a defendant to expend a peremptory challenge under rule 2.18(9), the defendant must specifically ask the court for an additional strike of a particular juror after his peremptory challenges have been exhausted. Where the defendant makes such a showing, prejudice will then be presumed.

*Id.* at 583. This "approach discourages a defendant who is satisfied with a jury notwithstanding a judicial error in failing to strike a potential juror for cause from engaging in a sandbagging approach of awaiting the results of a jury verdict before crying foul." *Id.* "It also tends to avoid another sandbagging scenario where the defense leaves an unqualified juror on the panel, awaits the verdict, and then appeals." *Id.*

Here, not only did Robinson not request an additional peremptory strike, he did not even use a peremptory strike to keep P.K. from serving on the jury. It is possible Robinson wanted P.K. to serve after hearing P.K.'s response showing dissatisfaction with law enforcement. We do not know. But even if the district court should have granted Robinson's motion to strike P.K. for cause, prejudice is not presumed. *See id.* And Robinson has made no efforts to establish he was prejudiced. So this claim fails.

**D. Jury Instruction.**

Robinson urges us to find reversible error in jury instruction no. 22—the instruction on attempted burglary in the first degree. But, as he recognizes, Robinson did not object to the jury instruction at trial and, as a self-represented defendant, he cannot claim ineffective assistance of counsel. *See State v. Hutchison*, 341 N.W.2d 33, 42 (Iowa 1983) ("[T]he defendant cannot knowingly and intelligently make an election to proceed pro se and then, having lost his trial on the merits, seek a reversal on appeal by claiming ineffective assistance of counsel."). To overcome these procedural hurdles, Robinson asks us to adopt plain error review for self-represented defendants.

But "[t]he law does not judge by two standards, one for lawyers and the other for lay persons. Rather, all are expected to act with equal competence. If lay persons choose to proceed pro se, they do so at their own risk." *Metro. Jacobson Dev. Venture v. Bd. of Rev.*, 476 N.W.2d 726, 729 (Iowa Ct. App. 1991). And our supreme court has "repeatedly rejected plain error review," including recently. *State v. Treptow*, 960 N.W.2d 98, 109 (Iowa 2021). We are not at liberty to overturn supreme court precedent. *Figley v. W.S. Indus.*, 801 N.W.2d 602, 608 (Iowa Ct. App. 2011). We do not consider this claim.

**III. Conclusion.**

Robinson waived his fair cross-section challenge when he acquiesced to the remedy provided to him by the district court, and his claims of ineffective assistance fail. Robinson did not prove he was prejudiced by the court's denial of his motion to strike a juror for cause, so that claim also fails. And, finally, we are not at liberty to use plain error review to consider Robinson's claim about a flawed jury instruction. We affirm Robinson's convictions.

**AFFIRMED.**